No. 14815

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

IN THE MATTER OF THE "A" FAMILY.

---

ORIGINAL PROCEEDING:

Counsel of Record:

> For Appellant:
>
>> Ted O. Lympus, County Attorney, Kalispell, Montana
>>
>> Johnathan B. Smith argued, Deputy County Attorney, Kalispell, Montana
>
> For Respondent:
>
>> Cannon and Gillespie, Helena, Montana
>>
>> Ross W. Cannon and Richard Gillespie argued, Helena, Montana
>>
>> John Albrecht argued, Choteau, Montana

---

Submitted: August 22, 1979

Decided: OCT 2  1979

Filed:

Thomas J. Kearney

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Child A is the male adopted son of H A and B A, the respondents in this case. Child A is within the age parameters of those entitled to special education as a handicapped child. The appellant is the school district in which the parents are residents. The appeal is from the mandatory injunctive order of the District Court, Eleventh Judicial District, Flathead County, requiring the school district to provide an educational placement for Child A including an intensive psychotherapy program at the Devereux Foundation, Santa Barbara, California, for one year. Transportation costs of the parents in connection with the placement of Child A were also required to be paid in the court's order.

The District Court denied the motion of the school district to amend or alter the findings of fact and mandatory injunction and this appeal timely followed.

For several years Child A was identified by the school district as mildly mentally retarded. He had been placed in the special education program in the public school system of his county, being "mainstreamed" into several classes for nonhandicapped students. His parents felt that he was not progressing in school and that he had periods of retrogression emotionally that made him uncontrollable, a danger to himself, and a threat to others. The parents took Child A at their own expense to the Developmental and Evaluation Clinic of the Children's Hospital in Denver, Colorado, for a complete educational evaluation. There the staff concluded that Child A was functionally retarded as a result of a primary handicapping condition of severe emotional disturbance, schizophrenic process.

The parents delivered the Children's Hospital report to the Child Study Team of their home school system. They asked

-2-

that Child A's identification be changed to severe emotional disturbance, schizophrenic process. They further asked that Child A be placed at the Devereux Foundation, in Santa Barbara, California, to receive intensive psychotherapy, along with a residential school program.

The Child Study Team decided that Child A was not severely emotionally disturbed, schizophrenic process, but rather that he was mildly mentally retarded and that he should not be placed in the Devereux Foundation. The parents requested a special education hearing regarding Child A's identification and placement. A hearing, however, was not held because the rules then in effect on special education complaints were repealed by the Superintendent of Public Instruction.

On May 15, 1978, the state Superintendent adopted emergency rules for special education complaints (Montana Administrative Register, May 25, 1978, issue no. 5, pages 764, 770). The parents of Child A renewed their request for a hearing. They named both the school district and the state Superintendent as antagonistic parties.

A hearing at the county level was held first. The hearing officer found that Child A was severely emotionally disturbed, schizophrenic process. He concluded that Child A was in need of an intensive psychotherapy program in a residential school such as provided by the Devereux Foundation. He dismissed the Superintendent as a party.

The school district appealed to the Superintendent of Public Instruction, who appointed a hearing officer for another hearing at the level of the Superintendent's office. The parents again named the Superintendent as a party. The hearing officer reached the same conclusions as the hearing officer at the county level.

-3-

The parents filed cause no. 29516 in the District Court, requesting a mandatory injunction ordering the Superintendent of Public Instruction and the Board of Trustees of the school district immediately to comply with the hearing officer's decision. That suit was filed on August 21, 1978. On September 26, 1978, the hearing officer appointed by the Superintendent issued findings, conclusions, and an order which generally affirmed the order entered by the local hearing officer. On October 26, 1978, the Board of Trustees of the school district filed complaint no. 29,732 in the District Court, seeking review of the hearing officer's decision. Both cases were eventually consolidated. The hearing officer that had been appointed by the Superintendent of Public Instruction also dismissed the Superintendent as a party.

On March 20, 1979, the District Court entered its findings of fact, conclusions of law, mandatory injunction and declaratory judgment, generally affirming the decision of the hearing officer, and requiring an educational placement of Child A in the Devereux Foundation for one year. The court also entered a declaratory order that the administrative rules of procedure adopted by the Superintendent of Public Instruction created a dual hearing procedure in which a parent must also proceed against the Superintendent of Public Instruction in this type of case. The District Court declared that such procedure violated the Education of All Handicapped Children Act of 1975, 20 U.S.C., §1415, on the ground that the administrative rules prevented a final decision being made where both the Board of Trustees and the Superintendent of Public Instruction were not a party to the same procedure.

The school district, through its Board of Trustees, appeals from the mandatory injunction finding that Child

-4-

A is severely emotionally disturbed, schizophrenic process and requiring that he be placed for one year in the Devereux Foundation. The Superintendent of Public Instruction appeals from the order of the District Court requiring that she be a party for final decision in the case at bar, and from the conclusion of the District Court that her administrative regulations deprived the parents of due process.

The school district presents these issues for review:

(1) Insufficiency of the evidence to support the findings of the District Court that Child A is severely emotionally disturbed, schizophrenic process, requiring his institutionalization at Devereux.

(2) Whether the institutionalization of Child A is in compliance with the requirement that he be educated in the least restrictive environment.

(3) Whether the school district is responsible for the provision of psychotherapy for Child A.

At a hearing before the District Court in which all parties were represented by counsel, it was stipulated that "Montana is a state which receives assistance under part B of the [federal] Education of the Handicapped Act, and that Georgia Ruth Rice is a state educational agency that receives assistance under part B of the Education of the Handicapped Act." It was further stipulated that in this case the State of Montana is bound by the applicable provisions of Public Law 94-142, _____ Stat. _____, the federal Education For All Handicapped Children Act of 1975. The federal statutes relating to the education of handicapped persons are found in 20 U.S.C. beginning at section 1401. Section 1415(e)(2) of Title 20 allows a party aggrieved by administrative hearings such as took place here to appeal to any state court of competent jurisdiction. That section also provides:

-5-

". . . In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

The District Court found that Child A was severely emotionally disturbed, schizophrenic process. It agreed with the Children's Hospital of Denver, Colorado, that Child A had perceptual difficulties, audio, visual and neurological incoordination and that Child A was classified as functionally retarded. His intelligence quotient has been measured at varying levels from 58 to 80. His academic progress showed a failure to learn; he had a history of periodic withdrawals from friendship, being socially insecure, fighting and complaining about being hurt; he had hidden in a bathroom for one-half hour at his school; had showed signs of frustration and nervousness. During his periods of withdrawal, his speech is slurred, he seems frightened, his dress habits are poor, and he does not appear to be oriented. He regresses to infantile behavior in these periods. Moreover, the District Court found that he had exhibited self-destructive behavior by running a razor over the back of his arm and standing in a dangerously hot shower. Doctors and Child Study Teams that had observed him reported him to be having severe emotional problems, severe emotional distress, and being emotionally insecure. Two hearing officers had determined that he was severely emotionally disturbed, schizophrenic process. Based on these findings, the District Court concluded that in order to give Child A an education appropriate to his needs, it was necessary that he be placed in Devereux for a period of one year, thereafter to be evaluated again.

The school district, on the other hand, claims that the findings of the District Court are insufficiently based on the evidence. It points to the evidence of Dr. William

-6-

Cook, a clinical psychologist who testified that Child A is not seriously emotionally disturbed and that he does not demonstrate a functional retardation; that his mental retardation is not the result of emotional problems, but rather is true mental retardation, secondary to which are emotional problems. Dr. Cook emphasized that Child A had excellent care in his parents' home and was in an environment which is stimulating and productive to his overall growth. Dr. Cook also attacked the findings of Children's Hospital based upon the educational competence of the staff that evaluated Child A. Dr. Cook also doubted that the child was suicidal or self-destructive, or a danger to others.

Another witness, Ronald Holter, a clinician at the Comprehensive Development Center in Missoula, testified that he was able to understand Child A, and that Child A made no inappropriate responses or suffered no blackouts during the time he observed him. He also criticized the Denver report in the use of some of the tests that were described in the Denver report.

Some of Child A's teachers also testified. One testified that Child A gets along socially, had no discipline problems and is making progress. Another testified that Child A puts forth effort in class though he does not do as well academically as other students, but he gets along well socially. Two school psychologists testified observing no abnormal activity by Child A in class or on the playground. They disagreed with the recommendations of the Children's Hospital because that hospital did not observe Child A in the educational setting in which he had been placed.

The school district has argued that in this case involving a mandatory injunction, we are dealing with a matter of an equitable nature. Therefore it contends, our duty of review is governed by section 3-2-204(5), MCA:

-7-

"In equity cases and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law, unless for good cause a new trial or the taking of further evidence in the court below be ordered. Nothing herein shall be construed to abridge in any manner the powers of the supreme court in other cases."

The order appealed from in this case is termed a "mandatory permanent injunction." If it were a true injunction, it would be equitable in nature, and perhaps section 3-2-204(5), MCA, would apply as to our duty of review. However, the true nature of the proceedings in the District Court was one of mandamus. Mandamus is an action at law, though it is sometimes controlled by equitable principles. 52 Am.Jur.2d 357 Mandamus §32. The distinction between injunction and mandamus is noted as follows:

"Another material distinction between the two remedies is found in the relief which they are designed to afford. Injunction is a remedy to restrain the doing of injurious acts or, in its mandatory form, to require the undoing of injurious acts and restoration of the status quo, while mandamus commands the performance of a particular duty which rests upon the defendant, or respondent, because of his official status or by operation of law. . ." 42 Am.Jur.2d 750 Injunctions §19. (Emphasis added.)

The order of the District Court here in effect commands the school district to perform a duty that devolves upon it by operation of law. Its true nature is that of mandamus, and it should be governed by like consideration. Miguel v. McCarl (1934), 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901. Therefore, section 3-2-204(5), MCA does not apply to our review here. We are not called upon to determine the issues of fact. Instead, the findings of fact by the District Court come to us for review on appeal in the cloak of Rule 52(a), Mont.R.Civ.P., not to be set aside unless they are clearly erroneous.

-8-

Moreover, the school district maintains that the report of the Children's Hospital in Denver, to which the school district made objection at the time of the trial, should not have been received into evidence, and that the District Court should have struck that report from the evidence on motion of the district. On this argument however, the school district is foreclosed by the provisions of 20 U.S.C. §1416, which provides that "the court shall receive the records of the administrative proceedings." The report of the Children's Hospital is a part of the administrative record and accordingly it is a part of the evidence which the District Court had to consider in determining the preponderance. This special provision of federal statutory law overrides any other consideration with respect to the reception into evidence of the Children's Hospital report even though we recognize the inherent evil in accepting hearsay evidence not subject to cross-examination.

On review of the record, on the facts set forth above, we sustain the finding of the District Court that Child A is severely, emotionally disturbed, schizophrenic process, requiring his placement in an educational surrounding such as Devereux.

The next issue raised by the district is whether it is in compliance with federal estate statutes and regulations to place Child A in Devereux when those statutes and regulations require that handicapped children be educated in the least restrictive environment.

It must be admitted that the policy of the State and federal statutes is to place handicapped children as far as possible to be educated with children who are not

-9-

handicapped. 20 U.S.C. §1412(5) requires a state which desires to participate in federal funding to establish procedural safeguards "to assure that . . . handicapped children . . . are educated with children who are not handicapped, and . . . that separate schooling . . . occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. . ." The Montana statute agrees (section 20-7-411, MCA). Yet the requirement is not ironclad because both the federal and state statutes provide that where the education of the child in regular classes cannot be achieved satisfactorily, separate schooling or other removal from the regular educational environment may be provided. Section 20-7-411, MCA.

The question becomes therefore whether the evidence supports the removal of Child A from the regular school environment in his county, or whether the special education program in his county, aided by such supplementary programs as the special education program of that county permits, is satisfactory to provide Child A with a "free appropriate public education". 20 U.S.C. §1412(1); Section 20-7-411(1), MCA; See 1972 Mont. Const., Art. X, §1.

Under section 20-7-414, MCA, the determination of what children require special education and the type of special education needed is the responsibility of the school trustees. The District Court concluded that the trustees in this case had abused their discretion in continuing to contend that the special education program in which Child A was participating in his home county was sufficient to meet his needs. The conclusion of the District Court stems from the facts which we have set forth above.

-10-

We find before us on the one hand the school district which contends that Child A is mildly mentally retarded, and the parents on the other hand who claim their child is severely emotionally disturbed. It is a difference in degree, but it is a difference the effect of which may be beyond our measure respecting the child. The District Court found from the evidence that as a participant in the mildly mentally retarded special education program, Child A has not been making substantial progress and may be retrogressing. It also found from the evidence that Child A is indeed severely emotionally disturbed. Once it had accepted that premise, it was necessary that Child A be placed in the Devereux Foundation school. The evidence supports no other choice.

> "In order to avoid any misunderstanding, it may
> be proper to add here that no more is required
> of the applicant [for a writ of mandate] than
> that he establish the material allegations of
> his complaint by a preponderance of the evidence."
> State v. Ford (1944), 116 Mont. 190, 202, 151
> P.2d 171, 176.

Therefore, when we review this case under Rule 52(a), Mont.R.Civ.P., substantial evidence supports the finding. We affirm the finding of the District Court that Devereux is a proper placement for Child A.

We come now to the third issue raised by the school district, that is, that psychotherapy is not properly allowable as a related cost for Child A, and that such costs should be born by the parents or other public agency.

In large measure, this issue arises out of confusing if not conflicting federal and state statutes and regulations relating to special education.

The pertinent federal statutes relating to the case at bar are these:

"Title 20, U.S.C. §1401(1)

"The term 'handicapped children' means mentally retarded,. . . speech impaired, visually handicapped, seriously emotionally disturbed children . . . who by reason thereof require special education and related services.

"Title 20, U.S.C. §1401(16)

"The term 'special education' means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions.

"Title 20, U.S.C. §1401(17)

"The term 'related services' means transportation, and such developmental, corrective and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

"Title 20, U.S.C. §1401(18)

"The term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

"Title 20, U.S.C. §1401(19)

"The term 'individualized education program' means a written statement for each handicapped child developed in any meeting by a representative of the local educational agency . . . who shall be qualified to provide . . . specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals,

-12-

including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation, and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, <u>whether instructional objectives are being achieved</u>." (Emphasis added.)

Under the foregoing statutes, and others, the Department of Health, Education and Welfare has promulgated certain federal regulations relating to the administration of the powers granted by the statute. The following definition contained in the regulations is pertinent:

45 C.F.R. 121a.5(b)(8) (1978):

"'Seriously emotionally disturbed' is defined as follows: (i) The term means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects education performance:

"(A) an inability to learn which cannot be explained by intellectual, sensory, or health factors.

"(B) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

"(C) Inappropriate types of behavior or feelings under normal circumstances;

"(D) A general pervasive mood of unhappiness or depression; or

"(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

"(ii) The term includes children who are schizo-phrenic or autistic.. . ."

We note parenthetically that Child A fits many of the criteria set forth in the definition of a seriously emotionally disturbed child.

"Related services", as used in the statute are administratively defined as follows:

45 C.F.R. 121a.13(a):

"As used in this part, the term 'related services' means transportation and such developmental corrective and other supportive services as are required to assist a handicapped child to benefit from special education, and includes . . . psychological services, physical and occupational therapy, recreation, early identification and assessment of disabilities in children, counseling services, and medical services for diagnostic or evaluation purposes.. . .

45 C.F.R. 121a.13(b)(4):

"'Medical services' means services provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services.

45 C.F.R. 121a.13(b)(8):

"'Psychological services' include:

"(v) Planning and managing a program of psychological services, including psychological counseling for children and parents."
(Emphasis added.)

We note from the federal regulations foregoing that "medical services" are provided only for diagnostic purposes and are paid for under the program when they result in establishing the child's need in special education and related services. On the other hand, "psychological services" are not so limited to diagnosis as specific authority is included for "planning and managing a program of psychological services" for the child which would come under the special education program.

The word "psychotherapy" is not specifically mentioned in the federal statutes or regulations. However, Webster's Seventh New Collegiate Dictionary (1965) defines "psychotherapy" as "treatment of mental or emotional disorder or of related bodily ills by psychological means." By that definition,

-14-

psychotherapy comes within the meaning of the term "psychological services".

The Montana statutes on special education begin at section 20-7-401, MCA. The state definition of an emotionally disturbed child is consonant with that found in the federal provisions as is the definition of special education. The attendance of a child in an out-of-state special education program is authorized in section 20-7-422, MCA.

The conflict with respect to psychotherapy arises out of the state administrative regulations promulgated by the Board of Education, in conjunction with the Superintendent of Public Instruction, as found in 48 A.R.M. 2.18(22)-S18430(2), as follows:

> "When a child is handicapped to such a degree that a totally controlled environment is needed, residential school placement may be essential. Room and board and tuition costs are considered allowable costs in the district's special education budget. The public school is only responsible for room and board and the educational kinds of costs. Other services such as psychiatric therapy and/or medical treatment must be deleted from the special education costs and assumed by parents and/or other agencies. When an out-of-district placement involves the payment of tuition or board and room, the placement must be approved by the Superintendent of Public Instruction."
> (Emphasis added.)

There is an obvious conflict between the specific deletion provided in the state administrative regulation above quoted, and the federal statutes and regulations which we have heretofore cited. The dilemna is answered however, by the state regulations which provide for submission to federal regulations when a conflict exists. 48 A.R.M. 2.18(46)-S18750 provides:

-15-

"FEDERAL PROGRAMS GENERALLY. (1) There are
several federal programs which have a portion
of the program charged to serve handicapped
children. Specific regulations published by
each program must be followed as well as the
Special Education Rules and Regulations. If
the Special Education Rules and Regulations are
in conflict with the federal requirements, then
the federal requirements supercede (sic).. . ."
(And the department of education too.)

We therefore hold that the federal regulations allowing

for psychological services, which includes psychotherapy, overrides

the state regulations which exclude psychotherapy. We are

comforted in this holding by the testimony of Dr. Paul

Spore, the federal programs manager in the office of the

Superintendent of Public Instruction. He testified:

". . . As long as the local team of professionals,
the Child Study Team, or as a result of a hearing
like this one, as long as the professionals there
rule that [Child A] needed the intensive psychotherapy
or family therapy kind of services in order again
to benefit from the public school instruction, those
would be appropriate and allowable costs and we
would certainly approve that."

The school district contends that our holding in Doe v.

Colburg (1976), 171 Mont. 97, 555 P.2d 753, is controlling because

there we held that the special education rules and regulations,

which we have quoted above, as promulgated by the State, delete

psychiatric therapy and/or medical assistance. However, we

distinguish Doe insofar as it applies to this case. The effect

of the federal statutes and regulations were not considered in

Doe and moreover, Doe was involved with medical services provided

by Dr. Kuska in Denver, Colorado. It is enough to say that

we find psychotherapy is not regarded as medical services

for the purpose of determining "related costs" under the

special education program promulgated by the federal government

but rather is included as part of psychological services,

which are a part of the related costs. Since in this case

it was stipulated that the special education program in the

home county of Child A was funded in part by the federal

government, the federal regulations apply and supersede

whatever regulations the state may have promulgated to the contrary.

We turn now to the contention of the Superintendent of Public Instruction on her appeal that the District Court erred in determining that the regulations promulgated by the Superintendent offend due process in that a dual procedure is necessary to obtain approval of an out of state special education program.

The issue is more technical than real, as an examination of the statutes, regulations, and the record will reveal.

Section 20-7-422, MCA, provides with respect to out-of-state special education:

> "(2)  Whenever the attendance of a child at an out-of-state special education program is approved by the superintendent of public instruction, it shall be the responsibility of the superintendent of public instruction, in cooperation with the department of social and rehabilitation services and the department of institutions, to negotiate the program for the child and the amount and manner of payment of tuition . . ."

The language of the quoted statutes implies that discretion is vested in the Superintendent in this case to grant approval or withhold approval for the out of state special education program.  This implication runs counter to the language of the federal statutes which require that the decision of the hearing officer in the appeal to the Superintendent of Public Instruction is final.  The applicable federal statute is 20 U.S.C. §1414(e)(1), as follows:

> "A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) [the hearing conducted before the Board of School Trustees] of this section shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection.  A decision made under subsection (c) of this section [the hearing conducted by the hearing officer for the Superintendent of Public Instruction] shall be final, except that any party may bring an action under paragraph (2) [providing for an appeal to the District Court] of this subsection."  (Emphasis and bracketed material added.)

-17-

It is evident from the foregoing federal statute that it is the intent of Congress that a party having gone through the administrative hearing processes before the local agency and the Superintendent of Public Instruction shall be entitled to a final decision, subject only to court appeal. This means that once the hearing officer for the Superintendent of Public Instruction had reached his decision in favor of the A family, under the federal statute, the Superintendent had no further right of discretion as to approval or nonapproval of the out-of-state education plan.

It is apparent to us that the Superintendent understood this intent of Congress because in the regulations which she promulgated to administrate the State special education program, and particularly with respect to hearings before her relating to proposed special education programs, it is provided "[t]he decision of the hearing officer is final unless a party seeks judicial review pursuant to section 82-4216, R.C.M. 1947, or brings a civil action pursuant to 20 U.S.C. 1415." Section A.R.M.
48/2.18(42), S18780(11).

The District Court received the impression during the trial that the Superintendent of Public Instruction had an adversary position to the A family with respect to the proposed program at Devereux. Because there was uncertainty, even among counsel, as to the extent of the Superintendent's right of approval or nonapproval of the application, the District Court denied a motion to dismiss the Superintendent as a party and eventually found that the State regulations instituted a dual procedure for approval which violated the due process requirement of the federal statute, 20 U.S.C. §1415(b)(2).

Later during the trial, unfortunately, counsel for the Superintendent requested an opinion of Dr. Spore as to the

-18-

appropriateness of the proposed placement at Devereux. Over objection Dr. Spore testified that it was his opinion that Kalispell rather than Devereux would be the appropriate program for Child A. He went on, however, to state that if the court ruled in Child A's favor, the Superintendent would approve the application without further claim of right of approval.

It was inappropriate for Dr. Spore to give his opinion as to the advisibility of the proposed placement at Devereux because the decision of the hearing officer both at the local level and before the Superintendent was that Devereux was a proper placement and their decisions were final under the federal law and the State's regulations. Neither the Superintendent nor her agents have authority to overrule the hearing officer who is required to be impartial, although appointed by the Superintendent. 20 U.S.C. §1415(b)(2).

Since, however, the Superintendent took the position during the trial that a decision of the District Court would be binding upon her and would be approved with no further claim of right of rejection on her part, such a stance was in harmony with the federal statutes, and with the State regulations. Therefore, we do not find a dual procedure rising out of the State regulations for special education programs, as long as the Superintendent maintains that she is bound by the findings of the hearing officer, and by the court, if an appeal is taken from the hearing officer.

The answer to the first contention of the Superintendent with respect to the claim of dual procedures under the regulations, also answers the second part of the Superintendent's appeal, that she is not properly a party to the case. The federal statutes and the State regulations contemplate that she not be a party. She has administrative duties, but she is limited and has no discretion with respect to special education programs

-19-

decided either by the Board of School Trustees, or by hearing officers upon appeals from decisions of the School Trustees. The hearing officers were therefore correct in dismissing the Superintendent as a party to the controversy. Likewise, the Superintendent is not a proper party in a court appeal from such hearing officer as long as the Superintendent adopts the stance that she has no discretion once the court has acted. She would, of course, be a necessary party if at anytime she contended that she had a right of discretion to approve or deny the application for special education after the hearing officers have acted, or after the court has made a final decision.

In light of the foregoing, therefore, the judgment of the District Court that Child A is severely emotionally disturbed, schizophrenic process, and requires placement in the Devereux Foundation for a period of one year, after which Child A shall again be evaluated, is affirmed; the decision of the District Court that the regulations promulgated by the Superintendent of Public Instruction for administrative hearings of appeals deny due process is reversed; the decision of the District Court that the Superintendent is a proper party to the action is also reversed, in view of the stance taken during the trial by the Superintendent that she had no power of discretion once the court had acted.

The Court commends the actions of the parties in providing for the placement of the child at Devereux Foundation pending the final decision of this Court.

_____
                                  Justice

We Concur:

_____
            Chief Justice

_____

_____
            Justices

-20-

The Honorable Gordon R. Bennett dissenting:

Neither the Superintendent nor the school district is responsible for providing free psychiatric treatment for Child A. Such coverage is not mandated by the Education of the Handicapped Act (Ch. 33, Title 20, U.S.C., §1401-1461, incl.) and it is effectively excluded by state regulation 48 A.R.M. 2.18(22)-S18430(2).

The federal act contains definitions of relevant terms, specifically, "related services" and "free appropriate education." These terms are defined as follows:

> "(17) The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children. (18) the term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under Section 614(a)(5)." (Emphasis supplied.)

The definition of "free appropriate public education" in 45 C.F.R. 121a.4 is identical to that in the code, with the exception of one word in the first part: ". . . special education and related services which: (a) Are provided at public expense,. . ." (Emphasis supplied.) Related services are further defined in 45 C.F.R. 1211.13. In that section, "'Counseling Services' means services provided by qualified social workers, psychologists, guidance counselors, or other qualified personnel." "'Psychological services' include (i) Administering psychological and educational tests, and other

-21-

assessment procedures; (ii) Interpreting assessment results;
(iii) Obtaining, integrating, and interpreting information
about child behavior and conditions relating to learning;
(iv) Consulting with other staff members in planning school
programs to meet the special needs of children as indicated
by psychological tests, interviews, and behavioral evaluations;
and (v) Planning and managing a program of psychological
services, including psychological counseling for children
and parents."

The Act does not express the requirement that all
"related services" mentioned in the Act must be provided by
the State. A careful reading of the definitions of "appropriate
public education" and the rest of the Act and the accompanying
regulations disclose the intent of the Act to be two-fold.
First, it is intended that all handicapped children will be
provided with the "related services" it presently provides to
any handicapped child. This purpose is reflected in the
requirement that the local educational agency identify those
handicapped children receiving the related services and those
handicapped children who are not. (20 U.S.C. §1414(a)(1)(A).)
Second, it is intended that the Act be an incentive for the
State to expand and improve its services to handicapped
children. This is reflected in 20 U.S.C. §1414(a)(1)(c) which
requires establishment of a goal of providing full educational
opportunities to all handicapped children. In other words, if
the State wants to participate in the federal program it is
required to offer to all handicapped children the related
services which it presently provides to some, and which meet
the standards of the Superintendent of Public Instruction, and
it is also required to aim at improving and expanding its
present services to ultimately achieve "full educational

-22-

opportunities" for all handicapped children. The Act does not intend that every state provide every imaginable "related service" just because a handicapped child would benefit by it. And the "related services" listed in the Act are not exhaustive. See Comment after 45 C.F.R. 121a.13. Each state must develop its own standards and goals in achieving full educational opportunities for all handicapped children. The federal act is not attempting to compel each state to provide identical or fully comprehensive services.

Montana has its own standards for providing services to handicapped children. In 48 A.R.M. 2.18(22)-S18430(2), the Superintendent of Public Instruction has interpreted the federal act in such a way that psychiatric therapy and/or medical treatment is excludable from special education costs. In pertinent part this regulation provides:

> "The public school is only responsible for room and board and the educational kinds of costs. Other services such as psychiatric therapy and/or medical treatment must be deleted from the special education costs and assumed by parents and/or other agencies."

Three years ago, this Court announced it found this same rule and this same language ". . . is reasonable and entirely consistent with/carrying out the legislative direction of Montana's statutes . . ." Doe v. Colburg (1976), 171 Mont. 97, 100, 555 P.2d 753, 754. Upon this finding, this Court set aside a District Court judgment ordering the Superintendent of Public Instruction to find a behavioral modification program to be carried on out of state by somebody with the title of "doctor". The issue was simply stated: ". . . whether special education funding can be used to provide psychiatric-medical treatment outside the State of Montana." The answer was an unequivocal "no". We are dealing here with the same funding

the same federal and state acts, the same regulation and the same kind of treatment. The only perceivable difference is that we have a different doctor and a different Superintendent. This Court now reverses itself on the ground it didn't consider the pertinent federal statutes and regulations three years ago. This year it holds the federal statutes and regulations require the financing of psychiatric-medical services. I have attempted to show there is no such requirement discoverable in the federal statutes and regulations. There is absolutely no showing that in the three intervening years the "feds" raised any question whatever, legally or administratively, about this Court's former ruling. As a matter of fact, the United States Commissioner of Education has continued since that time to approve of the "state plan" required to be submitted by the Superintendent of Public Instruction annually as a condition of funding (20 U.S.C. §1413). This statute requires the Superintendent to disclose every conceivable facet of her education for the handicapped program except the names of her nearest of kin, and it clearly requires inclusion of all regulations propounded under the federal act. And, as would be expected, if the Commissioner finds the plan does not comply with the Act he may cut off the federal money (20 U.S.C. §1413(c)(2)). There is, as has been noted, no showing whatever that the Commissioner has attempted to do so with regard to this or any other Montana regulation made under the Act.

The holding of the Court is that the federal regulations allowing for psychological services, which includes psychotherapy, overrides the state regulations which exclude

psychotherapy. In the first place, the state regulations do not exclude psychotherapy, they exclude payment for psychiatric therapy and/or medical treatment. Psychotherapy, not mentioned in either the federal act or regulations, may well come within the gamut of the psychological services authorized by the Act and regulations. And one can hardly argue with the heirs of Noah Webster, called upon to decide this case, that psychotherapy is "treatment of mental or emotional disorders or of related bodily ills by psychological means." Psychiatric therapy may well be one of those means. The only question here, as in the Colburg case, is whether the Superintendent is required to pay for it. The holding of the Court answers the question. The federal act may allow psychiatric therapy, I understand there is considerable controversy in Washington and elsewhere on the point, but it does not require it, thus there is no conflict between the federal act and regulations and the state regulation. The state regulation is, then, authorized by federal and state law and is, therefore, to be treated as law, not as a policy statement. Contrary to what is said in Colburg, this substantive legislative rule is entitled to more than respectful consideration. Being duly and properly propounded in conformity with the applicable statute (section 20-7-402(2), MCA) it is as binding on this Court as a legislative enactment. Section 2-4102(11)(a), MCA. To ignore or evade the rule is to repeal it, which is a legislative act not a judicial function.

For this reason, I would remand the case to the District Court for modification of the order appealed from to exclude payment by the Superintendent of Public Instruction and the school district for psychiatric therapy and medical treatment.

-25-

I must note in passing that the Court, with its unquestioned procedural rulemaking power, has made a new rule of evidence in this case. That rule could be stated: if federal statutes require, the Montana Rules of Evidence may be waived. This is the net effect of the ruling made here with regard to reception and consideration of the report of the Denver Children's Hospital, loaded as it is with hearsay, speculation and confusing conclusions, without providing the appellants an opportunity to examine its authors. It is said the school district was foreclosed from objecting to consideration of this report by the District Court because 20 U.S.C. §1415 (e)(2) provides in part, "In any action brought under this paragraph the court shall receive the records of the administrative proceedings,. . ." It could be that federal law may be invoked to nullify the provisions of parts (2) and (5) of section 2-4-612, MCA, the provisions of the Administrative Procedure Act requiring adherence at the administrative level to the rules of evidence and providing for cross examination of the authors of documents. And if the federal law requires it, I suppose there is no harm in the District Court receiving the entire record of an administrative proceeding, regardless of how filled up it might be with procedural and evidentiary error. But that cannot possibly mean that the District Court, in hearing and considering the matter, must disregard the rules of procedure and evidence in making its determination. Here there was, apparently, a timely motion to strike the report of the Denver Children's Hospital from consideration by the Court. In my opinion the motion should have been granted unless the authors of the report were presented to lay the foundation for its consideration and be subjected to cross examination with regard to it. To require less would be to abdicate the

-26-

authority of the Montana courts and legislature to determine procedure and evidentiary qualification to the composers of rules for the United States Department of Health, Education and Welfare. I would not do so.

Hon. Gordon R. Bennett
District Court Judge sitting
in for Justice Gene B. Daly

Justice

IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 14815

IN THE MATTER OF THE "A" FAMILY.

O R D E R

FILED

OCT 30 1979

*Thomas* _____
CLERK OF SUPREME COURT
STATE OF MONTANA

PER CURIAM:

IT IS ORDERED that the following corrections be made in the above-named opinion.

On the Title Page the words "ORIGINAL PROCEEDING" should be deleted and the following put in their place.

"APPEAL FROM:   District Court of the Eleventh Judicial District Honorable Arnold Olsen, Judge presiding."

The words "For Respondent" should be deleted and the same words "For Respondent" should be put just above the name of John Albrecht, who is the counsel for respondent. Cannon and Gillespie are counsel for appellant also, so their names may remain where they are.

On page 9, line 7 from the top of the page, please change the cite "20 U.S.C. §1416" to "20 U.S.C. §1415(e)(2)".

On page 9, line 7 from the bottom of the page, please insert the word "and" in between the word "federal" and the word "estate".

On page 16, from the top of the page, please delete line 10 which reads:  "(And the department of education too.)".

On page 17, line 15 from the bottom of the page should be changed to read:  "20 U.S.C. §1415(e)(1), as follows:"

On page 18, line 13 from the bottom of the page, please change "48 A.R.M. 2.18(42),S18780(11)" as follows:  "48 A.R.M. 2.18(42) - S18780(11)."

On page 18, line 1 from the bottom of the page, please change the spelling of the name of Dr. Spore to "Dr. Spoor".

On page 19, line 2 and line 7 from the top of the page, please change the spelling of the name of Dr. Spore to "Dr. Spoor".

On page 21, line 5 from the bottom of the page, please change the cite "45 C.F.R. 1211.13" to read:  "45 C.F.R. 121a.13.

On page 25, line 7 from the bottom of the page, please change "Section 2-4102(11)(a)" to read:  "Section 2-4-102(11)(a)".

DATED this *30th* day of October, 1979.

_____
Chief Justice

_____

_____

_____

_____
Justices