

DA 11-0048

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 265

JEFFERSON COUNTY, a political subdivision
of the State of Montana, by and through
its Board of Commissioners,

        Petitioner and Appellee,

   v.

DEPARTMENT OF ENVIRONMENTAL
QUALITY, an agency of the State of Montana,

        Respondent and Appellant,

   and

NORTHWESTERN CORP, d/b/a
NORTHWESTERN ENERGY,

        Intervenor and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DV 10-52
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Ed Hayes (argued), John F. North; Special Assistant Attorneys
General; Helena, Montana (attorneys for Department of Environmental
Quality)

        John K. Tabaracci (argued), Robert Erickson; Sullivan, Tabaracci &
Rhoades, P.C.; Missoula, Montana (attorneys for NorthWestern Energy)

For Appellee:

Mathew J. Johnson; Jefferson County Attorney; Boulder, Montana

Peter G. Scott (argued); Gough, Shanahan, Johnson & Waterman, PLLP; Helena, Montana

_____

Argued and Submitted: August 2, 2011

Decided: October 27, 2011

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    The Montana Department of Environmental Quality (DEQ) and Intervenor NorthWestern Energy (NorthWestern) appeal the Fifth Judicial District Court's judgment in favor of Petitioner Jefferson County. Appellants argue the District Court erred in issuing a writ of mandamus, granting summary judgment to Jefferson County, and enjoining DEQ from releasing a draft environmental impact statement. We reverse the District Court and remand with instructions to dismiss this action. We restate the issues as follows:

¶2    *1. Whether the District Court properly granted a writ of mandamus requiring DEQ to consult with the Jefferson County Board of Commissioners under § 75-1-201(1)(c), MCA, before issuing a draft environmental impact statement on the Mountain States Transmission Intertie.*

¶3    *2. Whether Jefferson County's action against DEQ is premature.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4    To meet increasing demands for electricity in the western United States, NorthWestern proposed constructing an electric transmission line running from approximately five miles southeast of Townsend, Montana, to a midpoint station near Shoshone, Idaho. The project, known as Mountain States Transmission Intertie (MSTI), would affect six counties in Montana and require the participation of numerous state agencies with overlapping jurisdiction concerning various aspects of the project. In order to commence construction of the MSTI, NorthWestern must first file an application and receive a certificate under the Major Facilities Siting Act (MFSA). DEQ and the United States Bureau of Land Management (BLM) are the lead agencies charged with review of

3

the project. Under state law, DEQ decides whether to issue a certificate and, if issued, determines the route of the MSTI.

¶5   Before submitting its application, NorthWestern held public meetings in order to identify potentially affected resources, suggest routes, and discuss mitigation of any adverse effects of the MSTI. NorthWestern representatives also attended a meeting of the Jefferson County Board of Commissioners on June 12, 2007, at which they provided a presentation on the MSTI including a map showing possible routes. NorthWestern invited the commissioners to raise concerns or issues involving the alternative routes. NorthWestern attended a second meeting on June 17, 2008, and provided updated information and received further input from Jefferson County.

¶6   On June 30, 2008, NorthWestern submitted its application for a certificate from DEQ under the MFSA. NorthWestern incorporated Jefferson County's comments into its application. NorthWestern's application has been available for public viewing on DEQ's website since July 8, 2008. NorthWestern also mailed newsletters to individuals and other parties, including Jefferson County, related to the MSTI.

¶7   To determine the extent of their environmental review, DEQ and BLM sent scoping letters to interested parties on August 8, 2008, indicating NorthWestern had proposed three alternative routes and additional alternatives might be developed during the environmental review. DEQ sent these letters to, among others, Kenneth Weber, Jefferson County Commission Chair; Tom Lythgoe, Jefferson County Commission Vice Chair; and Chuck Notbohm, Jefferson County Commissioner. The letters encouraged recipients to offer written comments on the route alternatives, to raise issues that should

4

be considered, and to provide possible mitigation measures and any other relevant information. The recipients also were invited to attend public scoping meetings in Three Forks, Butte, and Dillon.

¶8 DEQ and BLM facilitated a separate scoping process for governmental agencies by sending letters dated August 20, 2008, to the Jefferson County Board of Commissioners, as well as to commissioners in the other five counties through which the line might pass. Those letters stated the purpose of the scoping process was to encourage involvement by interested stakeholders in a manner that allowed for early identification and resolution of environmental issues. The letters included a map depicting the various alternative routes identified in NorthWestern's application. Recipients were invited to attend scoping meetings for governmental agencies to be held on the same dates and in the same locations as the general public meetings but several hours before them.

¶9 Jefferson County Commission Chair Weber attended both the public scoping meeting and the agency scoping meeting in Dillon on September 11, 2008. The Jefferson County Commissioners then discussed the MSTI in three separate meetings on September 16, September 30, and October 7, 2008. In all three meetings, Weber noted the October 10 deadline for submitting comments to DEQ was fast approaching. On October 10, 2008, the Jefferson County Commissioners submitted their comments to DEQ by electronic mail. In the letter, the commissioners acknowledged the benefits of the MSTI but stated they "should be brought forward in a manner that impacts private property in the least amount possible." The commissioners indicated this could be done by taking Jefferson County's zoning ordinances into consideration. The commissioners

5

also requested DEQ give preference to the third alternative route proposed by NorthWestern because it would impact the lowest number of current and future homes in Jefferson County.

¶10    In the course of preparing a draft of the Environmental Impact Statement (EIS), DEQ obtained Jefferson County's land use plans. DEQ representatives contacted Jefferson County to inquire about any additional land use and zoning regulations. DEQ reviewed the documents and determined the MSTI as proposed complied with Jefferson County's land use plans.

¶11    DEQ did not hear from Jefferson County again until it received a letter dated April 22, 2010. The commissioners informed DEQ that the County was invoking its "coordination authority" under state and federal law. The commissioners cited eleven federal laws in which the word "coordinate" appears. The only state law the commissioners cited was § 75-1-104, MCA (2009),[1] which states the Montana Environmental Policy Act's (MEPA's) provisions do not affect specific statutory obligations of an agency of the state to coordinate or consult with any local government. Jefferson County also indicated it was in the process of delineating a land-use policy and it expected DEQ and BLM to comply with the policy in determining the MSTI route. Jefferson County did not cite the consultation requirement in § 75-1-201(1)(c), MCA, on which it rests its claim in this appeal.

---

[1] When this action was filed, the applicable law was the 2009 version of the MCA. Unless otherwise indicated, all citations to the Montana Code Annotated are to the 2009 version.

¶12 DEQ responded on April 30, 2010, explaining the agency had consulted and coordinated with Jefferson County. DEQ detailed the multiple times DEQ, BLM, and NorthWestern had met with Jefferson County officials. DEQ also stated the commissioners' request would be difficult to accommodate as it came at the eleventh hour, sixteen months after the comment period and just weeks before DEQ and BLM were expected to finalize and release the Draft EIS.

¶13 Jefferson County and DEQ exchanged several letters between April and May 2010 concerning the MSTI. On May 18, 2010, Jefferson County filed a Petition for Writ of Mandamus and Injunctive Relief against DEQ. Jefferson County sought an order requiring DEQ to comply with MFSA, MEPA, the Federal Land Policy and Management Act, and the National Environmental Policy Act. Jefferson County further requested DEQ be enjoined from "planning, drafting, studying and releasing" a Draft EIS. DEQ met with the commissioners on May 27, and with Commissioner Tom Lythgoe on June 3, 2010, to discuss and provide additional information on the MSTI.

¶14 The District Court granted NorthWestern's motion to intervene on June 16, 2010, and held evidentiary hearings on June 21, July 7, and July 28, 2010. Although the presentation of evidence still had not concluded, Jefferson County filed a motion for partial summary judgment for declaratory and injunctive relief on August 18, 2010. DEQ and NorthWestern opposed the motion. On September 8, 2010, the District Court ruled in favor of Jefferson County after determining DEQ had not satisfied its duty to consult with Jefferson County under MEPA and enjoined DEQ from releasing the Draft EIS until it had done so. The County filed notice of entry of judgment on December 22, 2010.

7

¶15 On January 11, 2011, Jefferson County filed a motion seeking "additional relief in the form of an order requiring DEQ to establish a reasonable budget so that Jefferson County can engage an expert to assist the County in formulating its input to the Draft EIS." Jefferson County requested "an initial budget of $30,000 to pay an expert selected by Jefferson County[.]" The District Court had not ruled on the motion when DEQ and NorthWestern filed notices of appeal on January 25 and February 4, 2011, respectively.

## STANDARD OF REVIEW

¶16 The issuance of a writ of mandamus is a legal conclusion this Court reviews *de novo*. *Franchi v. County of Jefferson*, 274 Mont. 272, 275, 908 P.2d 210, 212 (1995). The writ is available only when the applicant is entitled to the performance of a clear legal duty against whom the writ is sought and there is no speedy and adequate remedy in the ordinary course of law. *Smith v. County of Missoula*, 1999 MT 330, ¶ 28, 297 Mont. 368, 992 P.2d 834. We review a district court's grant of summary judgment *de novo* and apply the same standard as the trial court. *Redies v. Attys. Liab. Prot. Soc'y*, 2007 MT 9, ¶ 26, 335 Mont. 233, 150 P.3d 930. To uphold the ruling there must be no issues of material fact and the moving party must be entitled to judgment as a matter of law. M. R. Civ. P. 56. Where a district court issues an injunction based on conclusions of law, we review that order *de novo* to determine whether the interpretation of law is correct. *St. James Healthcare v. Cole*, 2008 MT 44, ¶ 21, 341 Mont. 368, 178 P.3d 696.

**DISCUSSION**

¶17 *1. Whether the District Court properly granted a writ of mandamus requiring DEQ to consult with the Jefferson County Board of Commissioners under § 75-1-201(1)(c), MCA, before issuing a draft environmental impact statement on the Mountain States Transmission Intertie.*

¶18 MEPA requires agencies to prepare an EIS addressing the impacts of a proposed action that will significantly affect the quality of the human environment. Section 75-1-201(1)(b)(iv), MCA. Prior to preparing an EIS, agencies like DEQ are required to determine its scope by inviting interested parties, including local governments, other state agencies, and the public to assist in identifying issues the EIS will discuss. Admin. R. Mont. § 17.4.615. Next, DEQ prepares a Draft EIS which considers the comments received during scoping. The lengthy requirements for a Draft EIS include "the agency's preferred alternative, if any and its reasons for the preference" along with "a section on consultation and preparation" including "a listing of other agencies, groups, or individuals who were contacted or contributed information." Admin. R. Mont. § 17.4.617. DEQ then releases the Draft EIS for further review and comment from interested parties. If the Draft EIS generates substantial comment indicating a change in the analysis is necessary, DEQ drafts a supplemental Draft EIS, which is again released for comment. Admin. R. Mont. § 17.4.621. DEQ ultimately incorporates these comments into a Final EIS along with a recommendation on the action which triggered the environmental review. Admin. R. Mont. § 17.4.619.

¶19 Under § 75-1-201(1)(c), MCA, "prior to making any detailed statement . . . the responsible state official shall consult with and obtain the comments of . . . any local

9

government . . . that may be directly affected by the project." The word "consult" is not defined in MEPA or the administrative rules. The District Court defined consult in its Conclusions of Law as "to seek advice or ask the opinion of."

¶20 The District Court granted Jefferson County a writ of mandamus, ordering DEQ to consult with the County prior to issuing a Draft EIS. Specifically, the Court stated, "the parties are directed to develop and implement a reasonable process for consultation." DEQ and NorthWestern contend the trial court's order exceeded the directive imposed by the statute. Noting the District Court interpreted "consult" according to its dictionary definition, NorthWestern reasons that since interpretation was required, the legal duty was not clear. DEQ adds that because the court left it up to the parties to resolve how DEQ was required to consult with Jefferson County, there was no clear legal duty defined by law. Jefferson County responds that, although the statute does not spell out how the consultation is to be executed, there is no dispute it must be performed. Citing *In re "A" Family*, 184 Mont. 145, 602 P.2d 157 (1979), Jefferson County asserts there may be a clear legal duty even when a statute does not articulate the exact method of implementation.

¶21 Section 27-26-102, MCA, sets forth two requirements before a court may issue a writ of mandamus to compel an act: (1) the party applying for the writ must be entitled to the performance of a clear legal duty by the party against whom the writ is sought; and (2) there must be no speedy and adequate remedy in the ordinary course of law. *Best v. Police Dep't of Billings*, 2000 MT 97, ¶ 14, 299 Mont. 247, 999 P.2d 334. It has long been established that mandamus will lie only where the claimant "'has a specific right

10

and the public officer is acting ministerially and has no discretion in the matter[.]'" *Smith v. County of Missoula*, 1999 MT 330, ¶ 28, 297 Mont. 368, 992 P.2d 834 (quoting *State v. Cooney*, 102 Mont. 521, 529, 59 P.2d 48, 53 (1936)); *State ex rel. Robert Mitchell Furniture Co. v. Toole*, 26 Mont. 22, 28, 66 P. 496, 498 (1901). An act is ministerial when "the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment[.]" *Smith*, ¶ 28.

¶22 Section 75-1-201(1)(c), MCA, only requires that consultation occur before a detailed statement is released; it does not prescribe what constitutes consultation, how it is to be performed, or when the consultation requirement is satisfied. The District Court could not define the duty absent a dictionary and, even after applying the definition, the court left it to the disputing parties to discern the meaning of "consult" and satisfy whatever it entailed. Mandamus will lie to compel action, but not to control discretion. *State ex rel. Scollard v. Bd. of Exam'rs for Nurses*, 52 Mont. 91, 98, 156 P. 124, 126 (1916). Because the statute does not specify how much consultation should occur, of what the consultation should consist, or with what frequency consultation should be undertaken, DEQ has at least some discretion as to how to perform the act; thus, the requirement to "consult" is not ministerial and does not define a clear duty.

¶23 Jefferson County argues the only reason the duty is unclear is because DEQ has failed to implement the legislature's mandate by enacting rules that further explain what "consult" means. The County cites no statute expressly mandating such a rule. Assuming DEQ has authority to define a process for consultation, this would still be a discretionary act, rather than a ministerial one. Based on the language of § 75-1-

11

201(1)(c), MCA, and the District Court's deferential approach to its exact meaning, we cannot conclude the requirement DEQ consult with Jefferson County establishes a ministerial task devoid of discretion.

¶24 Jefferson County's reliance on *In re "A" Family* is misplaced. In that case, we distinguished mandamus from a mandatory injunction, noting that the former is an action at law, which "commands the performance of a particular duty" by the defendant, whereas a mandatory injunction requires "'the undoing of injurious acts and restoration of the status quo[.]'" *In re "A" Family*, 184 Mont. at 152-53, 602 P.2d at 162 (quoting 42 Am.Jur.2d 750 *Injunctions* § 19). Because the district court had upheld the findings of two administrative hearing officers and directed the defendant school district to place the plaintiffs' child in a residential program under mandates imposed by federal law, we concluded the action was in the nature of mandamus, and accordingly an action at law for which the district court's factual findings were subject to review for clear error. *In re "A" Family*, 184 Mont. at 152-53, 602 P.2d at 162. The issue in that case was the school district's compliance with federal law governing "the education of handicapped persons"; the district disputed whether the evidence supported the district court's conclusion that the child was severely emotionally disturbed and whether the local school district's special education program was sufficient to meet his needs. *In re "A" Family*, 184 Mont. at 150, 602 P.2d at 160-61. We did not address whether the statute imposed a clear legal duty, the performance of which could be compelled by mandamus.

¶25 While a writ of mandamus may be granted to compel an agency to act, the District Court ordered more, directing DEQ to "consult with and obtain comments from Jefferson

12

County at all stages of the process." The court supported its ruling by noting "[n]othing in the statute modifies or limits the consultation duty to a single event[.]" DEQ concedes there is no limitation in the statute but argues this only means it is free to consult with Jefferson County more than once, not that it is required to do so.[2]

¶26 We agree with DEQ that, at this stage in the process, it has not violated a clear legal duty to "consult with" the County and that the District Court erred in compelling the exercise of discretionary acts. Jefferson County contends it should be given an opportunity to play an active role in preparing the Draft EIS, but MEPA plainly applies to the review of "state actions" (§ 75-1-102(1), MCA) and calls for environmental review by "agencies of the state" (§ 75-1-201(1)(b), MCA). Further, under the MFSA, it is the province of DEQ, not the local government, to "commence an evaluation of the proposed facility and its effects, considering all applicable criteria listed in 75-20-301, and [to] issue a decision, opinion, order, certification, or permit[.]" Section 75-20-216(2), MCA. The only condition under § 75-1-201(1)(c), MCA, is that DEQ consult with Jefferson County "prior to making any detailed statement[.]" The statute does not mandate the county's active participation in drafting the statement. Section 75-1-201, MCA.

¶27 The record reflects DEQ already has expended considerable effort to include Jefferson County in the environmental review process. After receiving NorthWestern's

---

[2] DEQ does not contend, however, that seeking and obtaining comments alone satisfies its duty to consult. We note the agency's acknowledgment in this regard gives meaning to every word in the statute, which includes the requirement to both consult with *and* obtain comment from affected local governments. Section 75-1-201(1)(c), MCA. *See Cal. Wilderness Coalition v. U.S. DOE*, 631 F.3d 1072, 1087 (9th Cir. 2011). DEQ's administrative rules also reflect a distinction between consultation and comment during different points in the process. Admin. R. Mont. §§ 17.4.617(10), 17.4.618-17.4.619.

13

application, which incorporated recommendations from Jefferson County, DEQ sent Jefferson County several letters seeking input and requesting its attendance at scoping meetings. Jefferson County attended those meetings, discussed the MSTI, and provided its advice and comments to DEQ by letter. DEQ reviewed that letter and later obtained Jefferson County's land use and zoning plans to insure compliance should DEQ opt for a MSTI route that would impact Jefferson County. DEQ has engaged in communication with Jefferson County in the form of in-person meetings, e-mails, and telephone conferences at several times during the process. DEQ also responded to Jefferson County's letter invoking its "coordination authority" although the letter came well beyond closure of the comment period. Even after Jefferson County petitioned for mandamus and an injunction, DEQ continued meeting with the Jefferson County Commissioners concerning their request for coordination. During these meetings, DEQ answered the commissioners' questions regarding the MSTI and discussed the alternatives being considered in the Draft EIS. Whatever may be the agency's ultimate responsibilities in the MSTI application review, at this juncture in the process—prior to the issuance of even a Draft EIS—we cannot agree that DEQ has a clear legal duty to do more.

¶28 *2. Whether Jefferson County's action against DEQ is premature.*

¶29 Even if a clear duty was evident from the statute, a court is divested of the authority to issue a writ of mandamus if an adequate remedy exists in the ordinary course of law. *Newman v. Wittmer*, 277 Mont. 1, 12, 917 P.2d 926, 932 (1996). DEQ points to several remedies available to Jefferson County absent a writ of mandamus. First, MEPA

14

provides for a court challenge to an agency action for "failure to comply with or inadequate compliance with a requirement under this part[.]" Section 75-1-201(6)(a), MCA. Second, MFSA allows an administrative appeal and judicial review process at the request of "[a] person aggrieved by the final decision of the department on an application for a . . . permit under this chapter[.]" Section 75-20-223(1)(a), MCA.

¶30 Jefferson County argues those avenues of recourse are inadequate. To constitute an adequate remedy, the alternative "must be one that itself enforces the performance of the particular duty" rather than one which prohibits a harmful act. *State ex rel. Burkhartsmeyer Bros. v. McCormick*, 162 Mont. 234, 237, 510 P.2d 266, 268 (1973). Jefferson County contends the authorities cited by DEQ only provide a remedy for those injured by a final decision while the County's injury stems from being excluded from the decision-making process. It asserts once a decision has been made that negatively impacts the County, there is no adequate remedy.

¶31 Jefferson County relies on *Cal. Wilderness Coalition*, in which the court held that harm caused by inadequate consultation is not remediated by the opportunity to offer comments after a decision has been made. 631 F.3d at 1093. Jefferson County overlooks the Ninth Circuit's order that invalidated the government's decision for failure to comply with procedural requirements of the review process:

> Accordingly, as we have determined that § 216 required more than the notice-and-comment procedure adopted by DOE, and that DOE's failure to consult with the affected States was not harmless error, precedent and reason require that we vacate the Congestion Study and remand for the DOE to prepare a Congestion Study 'in consultation with the affected States.'

15

*Cal. Wilderness Coalition*, 631 F.3d at 1095. Under MEPA and MFSA, Jefferson County has the same remedies as the plaintiffs in *Cal. Wilderness Coalition* and the case therefore does not support its position. In a footnote to its brief, Jefferson County states a recent amendment to MEPA "limit[s] the remedy for MEPA non-compliance to agency remand and prohibit[s] judicial interference with any permit." The new law makes clear, however, that any changes to MEPA are prospective and apply only "to an environmental assessment and an environmental impact statement begun on or after [the effective date of this act]." 2011 Mont. Laws ch. 396, § 10. The amended statute was enacted on May 12, 2011, long after DEQ had initiated its environmental review process; therefore any limitations posed by the new law do not apply in this case and we express no opinion on the substance of the legislative changes.

¶32 MEPA provides "[a] challenge to an agency action under this part may only be brought against a final agency action[.]" Section 75-1-201(6)(a)(i), MCA. This language indicates a legislative preference for streamlining the environmental review process without the interruption of multiple court actions. The potential for undermining that policy is evident in this case where six separate counties and numerous state agencies may be impacted by the MSTI. The need for efficiency is further illustrated by § 75-20-216(4), MCA, which requires DEQ ordinarily to complete its environmental review and render a recommendation within nine months of accepting an application under the MFSA. This process is thwarted when any person or entity is allowed to challenge an action or inaction by the department before it renders a final decision. The statutory bar

16

until a final action is issued aims to avoid piecemeal litigation and micromanagement by the court in the environmental review process.

¶33 DEQ asserts, and Jefferson County does not dispute, that a final agency action in this context occurs only after DEQ issues, or declines to issue, a certificate under the MFSA. Section 75-20-223, MCA, supports this contention as it allows an aggrieved person to challenge the Department's "final permit decision." In this case, Jefferson County has an adequate legal remedy for any deficiencies in DEQ's permitting process. Given the express mandates of the law, it was premature for Jefferson County to bring an action against DEQ for failing to consult when DEQ has not yet released a Draft EIS, a potential supplemental Draft EIS, a Final EIS, or issued or denied a permit. DEQ has maintained throughout this litigation Jefferson County will have a continuing opportunity to consult with DEQ on its proposed action after a Draft EIS is released, and on a supplemental Draft EIS assuming significant new issues are raised relating to the MSTI. Even if Jefferson County is not afforded any additional opportunity to consult, DEQ may decide not to issue a permit to NorthWestern. The numerous contingencies present at this early stage of the review process further highlight why Jefferson County's claims are not ripe for review now.

¶34 The District Court's order granted both mandamus and injunctive relief. After concluding DEQ's consultation duty was ongoing, the District Court afforded Jefferson County an opportunity to participate during preparation of the Draft EIS and enjoined DEQ from releasing the Draft EIS until it properly had consulted the County. When a court issues an injunction based "upon its interpretation of a statute, no discretion is

17

involved and we review the district court's conclusion of law to determine whether it is correct." *Hagener v. Wallace*, 2002 MT 109, ¶ 12, 309 Mont. 473, 47 P.3d 847. Having concluded the District Court's legal rulings were erroneous, we likewise conclude its grant of injunctive relief was in error.

¶35 We reiterate Jefferson County is not without a remedy. Should DEQ issue a permit, Jefferson County may challenge that action if it has at that time a claim for a violation of MEPA or MFSA. However, mandamus and injunctive relief are not appropriate in this case and § 75-1-201(6), MCA, bars Jefferson County's suit until DEQ has rendered a final decision.

## CONCLUSION

¶36 Although DEQ's statutory obligations have not been completely discharged at this stage in the environmental review process, it has not violated a clear legal duty to consult with Jefferson County prior to issuing its Draft EIS. Since Jefferson County has adequate legal remedies once DEQ renders a final agency action, the County is not entitled to mandamus or injunctive relief. Accordingly, we reverse the District Court and remand with instructions to dismiss this action without prejudice.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ JIM RICE

18