DA 11-0213

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 15

KRUTZFELDT RANCH, LLC, a Montana Limited
liability company, WILLIAM J. KRUTZFELDT,
and JULIE A. KRUTZFELDT,

      Plaintiffs and Appellants,

   v.

PINNACLE BANK, a Wyoming corporation,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 10-0197
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Donald L. Harris (argued); Harman, Warren, & Harris, PLLP; Billings,
Montana

      For Appellee:

            Alan C. Bryan, Peter F. Habein (argued), Jeffery J. Oven; Crowley Fleck,
PLLP; Billings, Montana

                   Argued and Submitted:  December 13, 2011

                                 Decided:  January 31, 2012

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Appellants Krutzfeldt Ranch, LLC, William Krutzfeldt, and Julie Krutzfeldt (collectively "Krutzfeldts") appeal the Thirteenth Judicial District Court's order denying their motion to disqualify and to permanently enjoin the Crowley Fleck law firm from representing Appellee Pinnacle Bank in this action.  We reverse.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     In June 2008, the Krutzfeldts and Pinnacle Bank entered a loan agreement in which the Bank agreed to lend the Krutzfeldts $5 million to develop a subdivision in Billings, Montana.  Pinnacle Bank retained the Crowley Fleck law firm ("Crowley") to represent it in connection with the transaction.  In August 2009, Pinnacle Bank refused to disburse further funds under the loan, asserting the Krutzfeldts had not satisfied certain obligations under the agreement.  In February 2010, the Krutzfeldts, represented by Don Harris, sued Pinnacle Bank alleging breach of contract, breach of the covenant of good faith and fair dealing, and fraud.  Crowley continued to represent Pinnacle Bank in the litigation.

¶3     In June 2010, Harris retained attorney Lance Hoskins of Brekke & Hoskins, PLLC, to advise Harris and the Krutzfeldts on issues concerning liability, settlement, and tax ramifications of their case against the bank.  Harris had retained Hoskins in a previous matter for advice on potential settlement and verdict options to prevent exposing Harris's clients to unnecessary tax liability.  In the previous case, Hoskins drafted portions of the settlement agreement at the conclusion of the suit.  Harris stated that Hoskins's

involvement in that matter, while dormant for intermittent and lengthy periods, ultimately extended over several years of litigation.

¶4 Prior to retaining Hoskins in the Krutzfeldts' suit, Harris informed Hoskins that Pinnacle Bank was represented in the litigation by Jeff Oven of Crowley. Harris provided Hoskins with the pleadings, motions and briefs that had been filed and also discussed with Hoskins his view of the Krutzfeldts' liability claims and Pinnacle Bank's defenses. Hoskins was not disclosed as an expert to Pinnacle Bank or Crowley. On July 13, 2010, Hoskins sent Harris an e-mail that addressed liability issues and indicated Hoskins had conducted some preliminary research on the tax issues. Hoskins stated, "I have some theories that may have some merit after further research. I hate to scorch the earth yet. Let's talk via phone or in person."

¶5 On July 19, 2010, Harris and Mr. Krutzfeldt met with Hoskins and discussed the liability claims, defenses, damages, settlement options, and the results of Hoskins's initial tax research. Both Harris and Mr. Krutzfeldt understood that Hoskins would provide assistance as needed, such as drafting appropriate language for a settlement or verdict form. Harris advised Hoskins the trial date was set for February 28, 2011, and a settlement conference would take place in late 2010 or early 2011.

¶6 On July 21, 2010, Hoskins sent Harris an engagement letter which set forth the terms of Hoskins's work. The document appeared to be a standard engagement form and indicated the continuing nature of Hoskins's involvement in this matter:

> Thank you for asking Brekke & Hoskins PLLC (the "Firm") to represent and advise your firm regarding income tax issues for Butch Krutzfeldt

3

discussed below. Because clear and timely communication is important for serving clients well, we want to begin by stating certain mutual understandings about our services and charges.

Services. Our engagement is to assist your firm in reviewing income tax issues related to Butch Krutzfeldt's lawsuit against Pinnacle Bank and for such other matters as are agreed to in the future. . . .

Completing Our Services. We intend and expect to complete our services to your satisfaction. However, we will withdraw from representation if so requested by you. We *may also withdraw* if our fees are not paid timely *or for a reason required or permitted by professional rules*. At the conclusion of representation you may have on request a copy of any client files or papers, for which we would charge a reasonable copying cost. [Emphasis added.]

We appreciate the opportunity to be of service. If you have any questions about our services, or the fee and billing arrangements, please contact me.

The engagement letter did not state Hoskins's representation had concluded with the meeting held days earlier. Although not offered into evidence, the parties agreed the letter was sent with a bill of $2,375.00 for Hoskins's services thus far in the Krutzfeldt case. Both parties acknowledged the document did not say "final bill" or otherwise indicate Hoskins had completed his services in the matter.

¶7 On December 20, 2010, the parties conducted a settlement conference. Harris called Hoskins more than once the week before the conference and left a message informing Hoskins his help would be necessary if the parties neared resolution of the lawsuit. Hoskins did not return the call. The case did not settle and his expertise was not required at that juncture.

¶8 On January 5, 2011, Harris received a "Dear Client" letter from Brekke & Hoskins announcing that the two partners had joined Crowley effective January 1, 2011. The

4

letter stated, "[w]e feel we will be more responsive and efficient to your needs and the ever changing tax and regulatory world by utilizing the resources that Crowley Fleck has to offer." Hoskins had not mentioned to Harris and the Krutzfeldts his plans to take the position with Crowley, nor did he take any steps formally to terminate his representation pursuant to M. R. Pro. C. 1.16.

¶9 Upon receiving the letter, Harris called Crowley to inform Oven of the conflict. On January 7, 2011, at 3:16 p.m., Harris sent Oven an e-mail stating the conflict could not and would not be consented to or waived, and Crowley thus would need to withdraw as counsel for Pinnacle Bank. Harris asked Oven to notify him if Crowley voluntarily would withdraw, or if Harris would need to file a Motion to Disqualify. Crowley responded by letter that same day, stating, "[p]ursuant to Rule 1.10(c), we have established an ethical screen" to prevent both Hoskins and Brekke from having any involvement in the Krutzfeldt case or receiving any fee earned by the firm in that matter. The letter enclosed an e-mail Crowley sent to its employees on January 7, 2011, at 4:23 p.m., informing them of the screen and directing that "all staff, lawyers, and other employees of the firm are prohibited from discussing this matter" with either Brekke or Hoskins.

¶10 On January 14, 2011, the Krutzfeldts moved to disqualify Crowley from representing Pinnacle Bank in this case. The Krutzfeldts followed with a motion seeking to permanently enjoin Crowley from proceeding in the litigation. Crowley opposed the motion on the ground that, when Brekke and Hoskins moved to Crowley on January 1,

2011, all of their clients, including the Krutzfeldts, became "former clients" governed by M. R. Pro. C. 1.9. The trial court heard argument on the matter and subsequently denied the Krutzfeldts' motion to disqualify and for an injunction. In its order, the District Court noted, "[a]lthough Mr. Harris may have subjectively felt that Mr. Hoskins was retained throughout the entire litigation, there was no written agreement between the parties to support this position." The court concluded the attorney-client relationship between Hoskins and the Krutzfeldts ended in July 2010, following submission of Hoskins's bill. The District Court reasoned that, because the Krutzfeldts were former clients before Hoskins joined Crowley, the ethical screen was sufficient to allow Crowley to continue to represent Pinnacle.

¶11 Following receipt of the court's order, the Krutzfeldts renewed their Motion for Permanent Injunction and included a copy of the engagement letter, which had not previously been supplied to the District Court. In their brief to this Court, the Krutzfeldts stated they did not initially submit the engagement letter to the trial court because it was not relevant to Pinnacle Bank's argument that the Krutzfeldts became former clients as of January 1, 2011, when Hoskins joined Crowley.

¶12 On April 7, 2011, the District Court entered a nunc pro tunc order again denying the Krutzfeldts' motion. The court did not mention the engagement letter in its second order. The Krutzfeldts appeal the court's denial of the motion for a permanent injunction.

**STANDARD OF REVIEW**

¶13　A district court's denial of a motion to disqualify is reviewed for an abuse of discretion. *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 26, 303 Mont. 274, 16 P.3d 1002. While the denial of a temporary or permanent injunction is reviewed for "manifest abuse of discretion," deference is not applied to the district court's conclusions of law, which are reviewed de novo to determine whether its interpretation of the law is correct. *City of Whitefish v. Bd. of Co. Comm'rs of Flathead Co.*, 2008 MT 436, ¶ 7, 347 Mont. 490, 199 P.3d 201; *Jefferson Co. v. Dep't of Envtl. Quality*, 2011 MT 265, ¶ 16, 362 Mont. 311, 264 P.3d 715.

¶14　The existence of an attorney-client relationship generally is a question of fact. *See Iowa Supreme Ct. Atty. Disc. Bd. v. Netti*, 797 N.W.2d 591, 600 (Iowa 2011); *Int'l Tele-Marine Corp. v. Malone & Assocs., Inc.*, 845 F. Supp. 1427, 1431 (D. Colo. 1994). We review a district court's factual determinations for clear error. *In re Estate of McDermott*, 2002 MT 164, ¶ 22, 310 Mont. 435, 51 P.3d 486.

¶15　Application of the law concerning the termination of an attorney-client relationship to a given set of facts is a question of law. *Coyle v. Battles*, 782 A.2d 902, 906 (N.H. 2001). Ultimately, it is this Court's "constitutional mandate to fashion and interpret the Rules of Professional Conduct." *In re Rules of Prof'l Conduct*, 2000 MT 110, ¶ 9, 299 Mont. 321, 2 P.3d 806. A district court therefore commits reversible error if it misapplies those rules. *See Schuff*, ¶ 176, (Day, Dist. J., dissenting) (district court

abuses its discretion by applying the rules governing former clients to a situation involving a current client).

## DISCUSSION

¶16 ***Whether the District Court erred in denying Krutzfeldts' motions to disqualify Crowley Fleck and to enjoin Crowley from representing Pinnacle Bank in this action.***

¶17 In order to succeed on a motion to disqualify opposing counsel, a party "must offer sufficient proof that the continued representation of one party by the attorney or firm will prejudice or adversely impact the rights of another party in the matter pending before the court." *Schuff*, ¶ 36. While violation of a rule of professional conduct is not alone sufficient to justify disqualification of counsel, it serves as "additional weight that may tip the scales in favor of disqualification." *Schuff*, ¶ 36.

¶18 Application of the Rules of Professional Conduct in this case turns on whether the Krutzfeldts were current or former clients of Hoskins at the time he joined Crowley. Rule 1.7(a) states in pertinent part, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client[.]" Rule 1.10(a) imputes the conflict to other lawyers in the same firm and provides that "none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so . . . ." The District Court denied disqualification because it determined Hoskins did not have a concurrent conflict of interest.

¶19 Under M. R. Pro. C. 1.9(a):

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

While this rule prohibits a lawyer from representing an adverse party against a former client, the lawyer's disqualification is not imputed to other members of the firm if:

(1) the personally disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
(2) written notice is promptly given to any affected former client to enable it to ascertain compliance with the provisions of this Rule.

M. R. Pro. C. 1.10(c). Since the District Court found the Krutzfeldts were former clients, it concluded Crowley's screen of Hoskins and Brekke satisfied the Rule.

¶20 Crowley argued in the District Court that the Krutzfeldts were former clients because all of Hoskins's current clients necessarily became former clients when Hoskins joined Crowley. The District Court rejected this contention, stating:

Part of Mr. Hoskins' value, in addition to his legal skills, was his client base that he built up over years of practice. If that wasn't intuitively clear, the "Dear Client" letter certainly made it so. That client base did not somehow morph instantly when he joined Crowley Fleck, transforming all of his clients at his former firm into former clients.

We agree. The attorney-client relationship is not automatically terminated when a lawyer joins another firm. The "present-client standard continues *even though the representation ceases prior to filing of the motion to disqualify.*" *Schuff*, ¶ 45 (emphasis in original) (quoting *Unified Sewerage Agency of Wash. Co. v. Jelco Inc.*, 646 F.2d 1339, 1344-45

9

(9th Cir. 1981)).  An attorney "cannot avoid the automatic disqualification rule applicable to concurrent representation by unilaterally converting a present client into a former client prior to the hearing on the motion for disqualification."  *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1431 (1999); *see also In re Agway, Inc.*, 2005 Bankr. LEXIS 2945 *8 (N.D.N.Y. 2005) ("a law firm cannot avoid [its fiduciary duties] by abandoning the client and transforming a continuing relationship to a former relationship.").

¶21    The critical fact here is that, even if grounds for withdrawal existed under the terms of his engagement letter, Hoskins did not withdraw from his representation of the Krutzfeldts prior to accepting his new position.  He never informed the Krutzfeldts that his work for them had concluded, never terminated his representation of them, and never advised them he was contemplating joining Crowley.  The "Dear Client" letter gave no indication the Krutzfeldts were no longer Hoskins's client.  To the contrary, the letter contemplated future legal services: "We feel we will be more responsive and efficient to your needs and the ever changing tax and regulatory world by utilizing the resources that Crowley Fleck has to offer."  "Withdrawal is effective to render a representation 'former' for the purposes of this Section if *it occurs* at a point that the client and lawyer had contemplated as the end of the representation."  *Restatement (Third) of the Law Governing Lawyers* § 132 cmt. c (2000) (emphasis added).  In the absence of any affirmative steps by Hoskins prior to his transition, if the Krutzfeldts were Hoskins's

current clients on December 31, 2010, they remained in an attorney-client relationship at the time he signed on as a member of the Crowley team.

¶22   The District Court nonetheless determined the Krutzfeldts became Hoskins's former clients in July 2010, well before he moved to the Crowley firm. The court reached this conclusion because Hoskins met with the Krutzfeldts then, was paid for work he performed, and had not spoken with the Krutzfeldts since. The Krutzfeldts argue that absent termination of the relationship, they remained Hoskins's current clients.

¶23   Based on the objective evidence, a compelling piece of which apparently was not considered by the District Court, we conclude Hoskins had a concurrent conflict of interest at the time he took the job with Crowley. After the July 19 meeting, Hoskins sent Harris a formal engagement letter indicating the prospective nature of his services. Hoskins's bill for his services did not indicate it was a "final" bill, nor did he take any steps to conclude his relationship with the Krutzfeldts. That he was not consulted for the next several months was simply a matter of timing. Consistent with Harris's previous engagement of Hoskins, Hoskins's services only would be needed for particular components of the case. Following Harris's call to advise Hoskins of the upcoming settlement conference, Hoskins did nothing until sending Harris the form letter that advised all of Hoskins's clients he had joined Crowley. At no time did Hoskins advise Harris of any notice or intent to withdraw as counsel.

¶24   In concluding the attorney-client relationship had terminated, the District Court emphasized Hoskins's testimony: "Mr. Hoskins stated in his affidavit that he believed the

11

relationship ended in July, 2010. . . . Following the payment, it was reasonable for Mr. Hoskins to assume that his representation of the Krutzfeldts terminated. . . ." We have held, however, that the existence of an attorney-client relationship hinges on the client's reasonable belief that it exists. *Pro-Hand Servs. Trust v. Monthei*, 2002 MT 134, ¶ 14, 310 Mont. 165, 49 P.3d 56. The District Court failed to consider the impact of the engagement letter. It also failed to view that letter's prospective nature together with the equally prospective tenor of the "Dear Client" letter. Hoskins had an "obligation to show" the Krutzfeldts "did not believe that [he] continued to represent [them]." *In re Rossana*, 395 B.R. 697, 702 (Bankr. D. Nev. 2008). Although the "Dear Client" letter, standing alone, may not be sufficient to confer upon the Krutzfeldts the status of a present client, *Heathcoat v. Santa Fe Int'l Corp.*, 532 F. Supp. 961, 963 (E.D. Ark. 1982), when viewed in light of the additional evidence discussed above, Hoskins's correspondence supports the Krutzfeldts' reasonable belief that the attorney-client relationship continued to exist after the July 2010 meeting.

¶25 Crowley makes much of the fact that Hoskins had only a limited involvement in the Krutzfeldt matter. It points out that Hoskins did not participate in many important stages of the litigation, including an argument on a motion for summary judgment, the depositions of critical witnesses, and a settlement conference. We find this distinction irrelevant. Hoskins had been retained for a limited purpose, as stated in his engagement letter. The limited scope of Hoskins's engagement in the matter was authorized by M. R.

Pro. C. 1.2(c).[1] An attorney's duty to his client, however, is not dependent on the purpose for which he has been engaged. "[T]he mere fortuity that [the client] did not require more extensive or frequent services than he did cannot be the [attorney's] escape hatch[.]" *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 194 (D.N.J. 1989). Hoskins was retained for his expertise in tax matters. Although the specific tasks in which a lawyer was engaged might make the access to confidential client information insignificant in subsequent representation of an adverse party, the lawyer bears the burden of persuasion on that issue. *Restatement (Third) of the Law Governing Lawyers* § 132 cmt. h. No one contends Hoskins was not privy to confidential information. His limited specific role in the case does not diminish his professional obligations to the Krutzfeldts.

¶26 Crowley's argument that Hoskins was an undisclosed consulting expert in the Krutzfeldt case likewise is unavailing. As discussed above, Hoskins was not an expert witness, but was acting as legal counsel for the Krutzfeldts, albeit for a limited purpose. The duty to check for a conflict of interest fell on Crowley and Hoskins, not on Hoskins's clients. That Crowley's procedure for ascertaining conflicts failed to turn up the problem in this case is unfortunate, but it—not the Krutzfeldts—must bear the consequence.[2] In light of the evidence, the District Court's finding that the Krutzfeldts were former clients

---

[1] Although Rule 1.2(c) was amended in October 2011, the prior version also permitted attorneys to limit the scope of representation with the client's informed consent.

[2] Crowley acknowledged during oral argument that Mr. Krutzfeldt's name appeared on Hoskins's client list, but that for some reason it was neglected to be "flagged" as a potential conflict.

when he joined Crowley was clearly erroneous. Because they were current clients, M. R. Pro. C. 1.7(a)(1) and 1.10(a) govern Crowley's obligations in this case.

¶27 Our conclusion that Rule 1.10(c) may not be invoked to effectively screen Crowley from the imputation of Hoskins's conflict of interest does not end the inquiry. We have held a party must show "sufficient proof that the continued representation of one party by the attorney or firm will prejudice or adversely impact the rights of another party in the matter pending before the court." *Schuff*, ¶ 36.

¶28 In *Schuff*, we affirmed the District Court's denial of Klemens's motion to disqualify Schuff's counsel on the ground that the same law firm previously had represented Klemens. *Schuff*, ¶ 53. One factor in our decision was Klemens's failure to follow up on the District Court's denial by requesting injunctive relief. *Schuff*, ¶¶ 48-49. After resolution of the case six years later, Klemens sought a new trial based on the "tainted" legal proceedings. *Schuff*, ¶¶ 53-54. We noted Klemens had never requested a new trial from the district court and had not sought an injunction, supervisory control, or certification of the disqualification order for interlocutory appeal. *Schuff*, ¶¶ 40, 50. We concluded that a new trial was unwarranted, assuming there was a violation of Rule 1.7, because Klemens failed to substantiate prejudice "through the course of litigation[.]" *Schuff*, ¶ 55. We also advised that future conflict issues "should be brought up as early as possible so that a determination may be made that does not unduly prejudice any party." *Schuff*, ¶ 46 (quoting *In re Guardianship of Mower*, 1999 MT 73, ¶ 23, 294 Mont. 35, 979 P.2d 156). We noted this could be accomplished by attaching a request for

14

injunctive relief to the motion to disqualify, which would allow us to review the district court's denial of disqualification via interlocutory appeal. *Schuff*, ¶ 49.

¶29 Based on our admonishment in *Schuff*, the Krutzfeldts filed their motion to disqualify within days of discovering the conflict, and coupled it with a motion for injunctive relief. When the District Court denied both, the Krutzfeldts appealed to this Court for a final determination on the merits of disqualification before trial. The Krutzfeldts acted promptly and diligently in response to the conflict of interest, in the manner this Court directed for pursuing disqualification of opposing counsel. The required showing of prejudice is necessarily less when prompt action is taken to address the conflict, as opposed to after trial on the merits has occurred.

¶30 The Krutzfeldts have made a sufficient showing of prejudice in this case. They lost the time and money they invested in Hoskins. They lost their trial date because Hoskins's abrupt move rendered them without expert assistance just weeks before trial and prompted the need for their motion to disqualify. Without prior notice of Hoskins's move, they did not have an opportunity to elect to seek new tax counsel or to determine how to address the impending conflict. Aside from these setbacks, the Krutzfeldts assert the most damaging loss was that of their attorney's loyalty. They argue that to ignore a lawyer's duty of loyalty in this case effectively would sanction the opportunistic hiring of an adverse party's attorney to weaken and derail the adverse party's claim against the hiring client.

¶31 An attorney's duty of loyalty is "perhaps the most basic of counsel's duties." *State v. Jones*, 278 Mont. 121, 125, 923 P.2d 560, 563 (1996) (quoting *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067 (1984)).

> So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can an attorney evade it. . . . Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent.

*In re Johnson*, 2004 MT 6, ¶ 16, 319 Mont. 188, 84 P.3d 637 (quoting *Flatt v. Superior Court*, 885 P.2d 950, 957-58 (Cal. 1994)). A "lawyer owes the client 'undivided loyalty' at least until the litigation is at an end." *Agway, Inc.*, 2005 Bankr. LEXIS 2945, at *7. The duty of loyalty is also a critical factor when analyzing concurrent conflicts. "[R]epresentation adverse to a *present* client must be measured . . . 'against the duty of undivided loyalty which an attorney owes to each of his clients' . . . ." *Schuff*, ¶ 45 (emphasis in original) (quoting *Unified Sewerage*, 646 F.2d at 1344-45).

¶32 In addition to the dangers posed to clients, allowing attorneys to switch sides in the middle of litigation threatens the public's trust in the legal profession. We have noted "the public's confidence in the integrity of the Bar lies in the enforceability of the rules designed to protect the public from unprofessional behavior." *Johnson*, ¶ 17. "Every lawyer is responsible for observance of the Rules of Professional Conduct." M. R. Pro. C. Preamble, ¶ 13. When lack of observance leads to breach of the duty of loyalty and

16

resulting prejudice, disqualification is required. To hold otherwise would allow attorneys to continue representation in the face of a conflict of interest, leaving the client without meaningful recourse for protection against noncompliance with the Rules.

¶33 We acknowledge that disqualification has a significant effect on litigation and should be imposed sparingly. Disqualification burdens the judicial system with delays and it burdens the party that must retain and reeducate new counsel in the proceedings.

> If there are good reasons to disqualify counsel, then we accept the burdens that disqualification imposes. But there should be good reasons. If the legal system can respect the client's legitimate expectation of loyalty without disqualifying the law firm, then disqualification becomes unnecessary and expensive.

Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics: The Lawyer's Deskbook on Professional Responsibility* 352 (West 2011). Given that Hoskins never informed the Krutzfeldts of his prospective employment with Crowley or withdrew from representation prior to the move, there was no opportunity to implement a screen before Hoskins began working at Crowley. Accordingly, there is no course short of disqualifying Crowley which would respect Hoskins's duty of loyalty to the Krutzfeldts. Disciplinary action, which occurs subsequent to the violation and resulting harm, is an inadequate remedy for a party who, like the Krutzfeldts, had no prior notice and acted diligently under the circumstances.

¶34 Crowley nonetheless asserts the prejudice to the Krutzfeldts, if any, is minimal compared to Pinnacle Bank losing Crowley as counsel. The hardship to Crowley's existing client is most regrettable, particularly since it could have been avoided.

17

However, once it is determined that Rule 1.7 applies, the Rules do not contemplate a balancing of hardships. "Rule 1.10 imposes imputed disqualification automatically . . . without requiring any showing of either actual leakage or even actual access to confidential information; these are conclusively presumed." *In re Marra*, 2004 MT 8, ¶ 9, 319 Mont. 213, 87 P.3d 384 (quoting Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 14.4 (3d ed., 2003)). "[E]ven if . . . a balancing [of equities] could be made[, s]omething more important is also at stake here: the public perception of lawyers and of the administration of justice." *Picker Int'l Inc. v. Varian Assocs.*, 670 F. Supp. 1363, 1367 (N.D. Ohio 1987). "It is true that the requirements of Rule 1.10 are exacting, but there are good reasons for this stringent rule." *Marra*, ¶ 9. The Rules exist for the protection of clients.

¶35 Ultimate authority over the legal profession is vested in the courts, but the Rules are crafted to facilitate the profession's self-governance. "Self-regulation helps maintain the legal profession's independence from government domination. An independent legal profession is an important force in preserving government under law, for abuse of legal authority is more readily challenged by a profession whose members are not dependent on government for the right to practice." M. R. Pro. C. Preamble, ¶ 12. Neglect of an attorney's responsibilities under the Rules "compromises the independence of the profession and the public interest which it serves." M. R. Pro. C. Preamble, ¶ 13. Forcing a client to resort to the courts when the Rules compel withdrawal of counsel only

18

adds to the client's litigation costs, increases delay in the proceedings, and furthers dissatisfaction with the profession and the system of justice.

¶36    Adherence to the Rules of Professional Conduct, on the other hand, does not bar attorneys from pursuing new employment while they are currently serving clients. Rather, an attorney may terminate representation when "withdrawal can be accomplished without material adverse effect on the interests of the client[.]" M. R. Pro. C. 1.16(b)(1). Ordinarily, when a lawyer leaves a firm, the client can choose whether to be represented by that lawyer, by lawyers remaining at the lawyer's former firm, by neither, or by both. *Restatement (Third) of the Law Governing Lawyers* § 31 cmt. f.  In this case, since the Brekke & Hoskins firm appears to have disbanded, the Krutzfeldts were not presented with that choice.  Hoskins, however, could have delayed his move to Crowley until after the trial or could have discussed with the Krutzfeldts his wishes to join the firm prior to doing so and taken appropriate steps to withdraw from their representation.  In that case, a proper screen could have been implemented to protect the Krutzfeldts' confidences.

¶37    When a lawyer is engaged in concrete discussions of future employment with an adversary's law firm, the lawyer must promptly inform the client.  "Without effective client consent . . . the lawyer must terminate all further discussions concerning the employment, or withdraw from representing the client." *Restatement (Third) of the Law Governing Lawyers* § 125 cmt. d.  Unfortunately, neither protocol was followed in this case.  By the time the conflict was disclosed, it was too late.  The conflict was concurrent and thus imputed to Crowley.  And, even had the Krutzfeldts become Hoskins's former

19

clients, the measures Crowley took were inadequate to preserve the Krutzfeldts' confidences. "Where screening mechanisms are not immediately implemented, and are instead instituted only after the conflicted attorney's former client asserts the existence of a conflict, the ethical screen is not timely implemented." *Stimson Lumber Co. v. Int'l Paper Co.*, 2011 U.S. Dist. LEXIS 3769 **13-14 (D. Mont. 2011). Finally, although the Rules are not to be "invoked by opposing parties as procedural weapons[,]" M. R. Pro. C. Preamble, ¶ 21, there has been no such manipulation in this case. The conflict was not manufactured by the Krutzfeldts and, as noted, they took prompt action once it became known.

¶38 The District Court erred in denying the Krutzfeldts' motions. The Crowley Fleck law firm is disqualified from continuing as counsel for Pinnacle Bank in this action. We reverse and remand for further proceedings consistent with this opinion.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ JIM RICE