763 S.E.2d 54

Julie TUTEN, Respondent,

v.

David Charles JOEL, individually and d/b/a Joel & Associates, P.A. and/or Joel & Associates; David C. Joel, Attorney at Law, P.C.; and Heather A. Glover, Defendants,

Of whom David Charles Joel is the Appellant.

Appellate Case No. 2012–211915.

No. 5268.

Court of Appeals of South Carolina.

Heard April 8, 2014.
Decided Aug. 27, 2014.

Harvey MacLure Watson, III and Desa Allen Ballard, Ballard & Watson, both of West Columbia; and Stephanie Nichole Weissenstein, of Gilbert, for Appellant.

Tom Griffin Woodruff, Jr., of Aiken, for Respondent.

FEW, C.J.

David Charles Joel appeals from a $275,000 jury verdict against him for legal malpractice in connection with his representation of Julie Tuten. Joel argues the trial court erred in: (1) granting a partial directed verdict for Tuten; (2) denying his directed verdict motion; and (3) denying his motion for a new trial nisi remittitur. We affirm.

### I. Facts and Procedural History

Joel is an attorney licensed in Georgia. Starting at least in 1993, he maintained a personal injury law practice in Atlanta. In 1996, he opened an office in Columbia, South Carolina. He advertised extensively in the yellow pages of phonebooks all over South Carolina under the name Joel & Associates. The ads purported to offer prospective clients "All the Help the Law Allows." Joel was never licensed in South Carolina.

On October 18, 2003, Tuten sustained severe injuries in a motor vehicle accident in Aiken County while riding as a passenger in a car driven by Clifton Still. After she recovered, she saw Joel's ad in the Aiken phone book. Joel was the

only attorney named and pictured in the ad. Tuten called the telephone number listed in the ad, and a non-lawyer investigator came to Tuten's home. The investigator interviewed her and provided her a contingency fee agreement, which she signed. The agreement provided, "Client ... hires Joel & Associates, P.A.... to represent us as legal counsel for all purposes in connection with claims for damage arising out of" her accident, and stated, "Client will pay [Joel & Associates] an attorney fee of 33 1/3% of the total money recovered...." When asked at trial whom she "ultimately decide[d] to hire as a lawyer," Tuten testified, "Joel. Mr. Joel."

On December 15, 2003, Joel's firm sent Tuten two letters on Joel & Associates letterhead, one of which thanked her "for retaining Joel and Associates to pursue a recovery in your claim for personal injury." That letter was signed by Heather Glover, an attorney then licensed in South Carolina whom Joel employed in his Columbia office.[1] There is no evidence Tuten was aware of Glover's involvement in her case until she received this letter.

In May 2006, Joel decided to close his Columbia office. Joel tried to get another attorney to take all his South Carolina cases, but no attorneys were interested.

Glover sent Joel an email dated May 14, 2006 stating, "I talked to two other attorneys ... about taking the cases and neither one of them is willing to take all the cases." She wrote:

The only way I see this office closing on the 24th like you want is if I keep the cases and work on them on my own. It is not my first choice and I would not be permanently opening an office on my own. But what I am willing to do is take all the current cases and work them to conclusion, giving you 1/3 of the generated fees.

She wrote that unlike the attorneys who declined to take the cases, she could "handle them without having to get permission from the clients." This approach gave them, she explained, "the better chance *we* won't loose [sic] them all

---

1. Glover is no longer licensed to practice law. The supreme court placed her on interim suspension on October 1, 2008, *In re Glover*, 380 S.C. 22, 667 S.E.2d 728 (2008), and disbarred her on January 7, 2011. *In re Glover*, 390 S.C. 643, 704 S.E.2d 347 (2011).

together [sic]." (emphasis added). Finally, she offered that if Joel could not "get out of paying the phone bill" for the "1–800" number, "I would take any new cases generated on the same arrangement of giving you 1/3 of any fees generated."

Glover sent Tuten a letter dated May 24, 2006 on Joel & Associates letterhead stating:

I am sending this letter to let you know that David Joel is retiring from his South Carolina office. Since I have been the attorney handling your case and will continue to handle your case to conclusion, this change should not affect you in any way. The Stat [sic] Bar does require that I send you this letter advising you of the situation and also advising you that Mr. Joel will receive 1/3 of all attorney's fees generated on your case even though he will no longer be open in South Carolina. The split in attorney's fees does not in any way affect the amount of money you will receive.

On October 17, 2006—the final day for filing a claim before the statute of limitations expired [2]—Glover filed a summons and complaint on Tuten's behalf against Still in the Aiken County Court of Common Pleas. There is no evidence Joel or Glover served the summons and complaint or took any other action to pursue Tuten's lawsuit. In November 2007, the circuit court dismissed Tuten's case for failure to prosecute.

In October 2009, Tuten sued Joel, his law firm, and Glover for malpractice. Glover, who by that time had left South Carolina, defaulted. Joel's law firm declared bankruptcy before trial and did not participate. At trial, both Tuten and Joel made directed verdict motions. The trial court granted a partial directed verdict in favor of Tuten, and denied Joel's motion. The jury returned a verdict for Tuten in the amount of $275,000. Joel filed post-trial motions for judgment notwithstanding the verdict, new trial nisi remittitur, and new trial absolute, all of which the trial court denied.

## II. Tuten's Partial Directed Verdict Motion

■ To succeed on her legal malpractice claim against Joel, Tuten was required to prove: (1) she and Joel had an attor-

---

2. *See* S.C.Code Ann. § 15–3–535 (2005) (providing a three-year statute of limitations).

ney-client relationship; (2) Joel breached his duty to her; (3) Joel's breach of duty proximately caused her some damages; and (4) the amount of her damages. *RFT Mgmt. Co. v. Tinsley & Adams LLP*, 399 S.C. 322, 331, 732 S.E.2d 166, 170 (2012). The trial court granted a directed verdict for Tuten on the first three elements. We review the trial court's decision—separately as to each element—by applying the same standard as the trial court. 399 S.C. at 331–32, 732 S.E.2d at 171. We view the evidence and all reasonable inferences in the light most favorable to Joel. *Id.* As to each element, we "must determine whether a verdict for [Joel] would be reasonably possible under the facts as liberally construed in his favor." *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006). "[I]f the evidence yields more than one reasonable inference or its inference is in doubt" as to any one of the first three elements, then the trial court should have submitted the issue to the jury and we must reverse. *RFT*, 399 S.C. at 332, 732 S.E.2d at 171; *see also Erickson*, 368 S.C. at 463, 629 S.E.2d at 663.

We hold the trial court correctly granted a partial directed verdict for Tuten. Specifically, we find the evidence yields only one reasonable inference as to each of the first three elements—(1) Joel and Tuten had an attorney-client relationship at the time her lawsuit against Still was filed and when it was dismissed; (2) Joel breached his duty to Tuten; and (3) Joel proximately caused at least some of her damages—and it was not reasonably possible the jury would return a verdict for Joel.

## A. Attorney–Client Relationship

The first element Tuten was required to prove was the existence of an attorney-client relationship. *RFT*, 399 S.C. at 331, 732 S.E.2d at 170; *Rydde v. Morris*, 381 S.C. 643, 646, 675 S.E.2d 431, 433 (2009). We readily conclude the trial court correctly directed a verdict for Tuten on this element.

Joel conceded at oral argument that once Tuten signed the fee agreement with Joel's firm, she entered into an attorney-client relationship with Joel, and therefore he was Tuten's attorney at that time. Joel argues, however, he ended the relationship when he closed the Columbia office and allowed Glover to take Tuten's case. We disagree. An attorney may

not end an attorney-client relationship, and thus relieve himself of the duties arising under it, by unilaterally deciding to allow another attorney to take responsibility for fulfilling those duties. Rather, at a minimum, an attorney must communicate to his client his desire to withdraw from their attorney-client relationship in such a manner that the client understands her attorney will no longer represent her.[3] If the attorney does not take such action, the attorney-client relationship continues.

We find no evidence Joel took any action to end his attorney-client relationship with Tuten. To the contrary, the only communication Tuten received came from Glover. Glover's letter informed Tuten "this change should not affect you in any way." Significantly, Glover's letter stated, "Mr. Joel will receive 1/3 of all attorney's fees generated on your case." Glover's letter contains no explanation of how Joel could receive an attorney's fee for *not* being Tuten's lawyer.[4]

Joel argues Glover's letter informed Tuten that Joel was no longer representing her because it stated, "David Joel is retiring from his South Carolina office." This statement did nothing more than inform Tuten that her attorney—Joel—would be working only out of his Atlanta office. Joel also argues Glover's sentence, "I have been the attorney handling your case and will continue to handle your case to conclusion," indicated Joel was no longer her attorney. We disagree because the sentence relates only to Glover. At most, the sentence indicated Glover was *also* Tuten's attorney. Viewing Glover's entire letter in the light most favorable to Joel, we

---

**3.** The criteria for withdrawal are stricter after an attorney becomes counsel of record in a lawsuit. *See, e.g.,* Rule 11(b), SCRCP ("An attorney may be changed by consent, or upon cause shown, and upon such terms as shall be just, upon application, by order of the Court, and not otherwise.").

**4.** We address below the legal significance of fee-sharing agreements between attorneys. Here, the significance is practical—the effect Glover's letter had on Tuten. Joel argues Tuten necessarily understood from the letter that Joel would no longer be her attorney. However, lay clients like Tuten correctly believe lawyers get paid for fulfilling—not withdrawing from—their responsibilities to their clients. Therefore, apart from the legal significance of a fee-sharing agreement, the practical significance of Glover's statement that Tuten must pay Joel is the opposite of what Joel argues—it is that Tuten necessarily understood Joel would remain her lawyer.

find the letter did not convey to Tuten that Joel would no longer be her lawyer.

Tuten called retired law professor John P. Freeman as an expert witness. Joel stipulated Professor Freeman was qualified as an expert in numerous specific subjects, including "professional duties in handling litigation for clients" and "duties owed by lawyers when withdrawing from representation." Professor Freeman explained that under basic concepts of professional responsibility, Joel remained Tuten's lawyer. First, he explained that because Joel had an agreement with Glover to receive a portion of the fee generated on Tuten's case, he retained a duty to represent her. He testified:

> My opinion is that he is accountable and I'll explain it this way. . . . You don't get that fee in exchange for nothing. At a minimum you have to assume responsibility for what happens in that case. You want the money? Fine. If something goes bad or there is malpractice, guess what. You've got a problem because you become accountable under our rules and that is—that is absolutely key.

Second, Professor Freeman explained Joel never withdrew from his attorney-client relationship with Tuten. He testified an attorney "can't just walk away" when he wants to cease representation, and Joel "never disavowed that he was her lawyer."

Joel counters Professor Freeman's expert testimony with two arguments, both of which we find disingenuous. First, Joel attempts to deny he had an agreement with Glover to share fees on Tuten's and other cases. Joel testified Glover "mentioned she would pay a third of the fees that she received to us." Following up on this statement, Joel testified on direct:

> Q: Now, you mentioned that [Glover] offered to share her fees with you on the cases that she took over and continued to handle. Would you require her to pay some portion of the fees to you as a condition of her taking those files?
>
> A: No.
>
> Q: Did you, in fact, receive any fees as a result of any of the files that [Glover] took with her?

A: No.

Q: So when a reference is made to a fee-sharing arrangement on the files that transferred out, there wasn't one, was there?

A: No. She suggested that in an e-mail to me. There was never a written agreement about it.

Q: So did you or did you not have a fee-sharing arrangement with Heather Glover—

A: Nothing—

Q: On the files that left?

A: Nothing that was enforceable in any way.

A careful examination of the record reveals Joel's testimony—that he had no agreement to share fees with Glover—is not correct. The truth is his law firm, David C. Joel, Attorney at Law, P.C., filed a lawsuit against Wachovia Bank for money Joel claimed Glover misappropriated. The lawsuit was premised on the existence of the very agreement that Joel attempted to deny at trial and continues to deny on appeal. In the "Verified Complaint" Joel filed to initiate the lawsuit, he alleged:

> In ... May 2006 Joel & Associates ... entered into an agreement with Glover under which she would continue handling representation of Joel & Associates' remaining South Carolina cases with an agreement to split fees with Joel & Associates.

The verification attached to and filed with the complaint states:

> Personally appeared, David C. Joel, an authorized affiant of David C. Joel, Attorney at Law, P.C., who after being duly sworn, states that the facts alleged in the foregoing Plaintiff's Verified Complaint are true and correct based on my personal knowledge.

On cross-examination, Joel was asked, "And your statement on this lawsuit against Wachovia is that you had a fee sharing agreement with Heather Glover; is that correct?" He answered, "Yes."

Joel's testimony that he did not "receive any fees as a result of any of the files that [Glover] took with her" is likewise false.

The truth is Joel received over $100,000 of those fees from the proceeds of his lawsuit against Wachovia. While Joel did not technically receive those funds directly from Glover, he received the funds only because they represented fees Glover owed him pursuant to their fee sharing agreement.[5]

We find that the only reasonable inference to be drawn from the evidence in this case—viewed in the light most favorable to Joel—is he had an agreement with Glover to share fees on Tuten's and other South Carolina cases.

The second argument Joel makes to counter Professor Freeman's testimony is that Joel did not lead Tuten to believe he was still her attorney after he closed his South Carolina office, and if Tuten had such a belief, there was an issue of fact as to whether her belief was reasonable. This argument incorrectly frames the issue.[6] The correctly framed issue is whether Joel took action to end the attorney-client relationship that he concedes existed when Tuten signed the Joel & Associates fee agreement in 2003. On review of the directed

---

**5.** Joel testified his Columbia office did not try cases, and referred cases they could not settle on their own to one particular trial attorney, Pat McWhirter. Six of the checks Joel alleged Glover misappropriated were written on McWhirter's firm account. One of those six checks was written only three weeks after Joel closed the office. This check conceivably could represent a settlement reached before May 2006, and thus represent fees not covered by the alleged fee-sharing agreement. However, five of the six checks were dated at least two months after Joel closed his Columbia office, and two of the checks were dated in February and March of 2007. Moreover, Joel alleged in his complaint against Wachovia that twenty-four additional checks Glover misappropriated did not come from McWhirter's firm. Those checks were necessarily issued by firms Glover associated, which under Joel's testimony could have occurred only after Joel closed the Columbia office, or were issued directly to the firm by defendants or insurance companies, in which case Joel would have known of the settlement if it occurred before May 2006. It is indisputable, therefore, that almost all the checks Joel sued to recover came from settlements that occurred after he left South Carolina, and Joel's entitlement to the fees represented by those checks depended upon a valid fee-sharing agreement with Glover. We find nothing to the contrary in the May 14, 2006 email.

**6.** Even if this were the correct way to frame the issue, Professor Freeman explained that Joel reasonably indicated to Tuten that he was still representing her by participating in an arrangement with Glover through which Tuten received "false and misleading communications that tricked [Tuten] into believing that David Joel was still her lawyer."

verdict ruling that Joel did not end the relationship, the issue is whether there is any evidence in the record upon which a jury could reasonably conclude Joel withdrew from his representation. As we explained, there is no such evidence in this record.

■ The principle that an attorney may not unilaterally withdraw from an attorney-client relationship without notice to the client is fundamental to the fiduciary nature of legal representation. *See generally Ex parte Strom,* 343 S.C. 257, 263, 539 S.E.2d 699, 702 (2000) ("Strong policy considerations dictate that a client . . . must be unequivocally informed when an attorney intends to withdraw from representing a party, for whatever reason."); *Graham v. Town of Loris,* 272 S.C. 442, 452, 248 S.E.2d 594, 599 (1978) ("An attorney who undertakes the conduct of an action impliedly stipulates to carry it to its termination and is not at liberty to abandon it without . . . reasonable notice.").[7]

■ The contrary position—taken by Joel—that an attorney's uncommunicated choice to withdraw from representation is effective unless the attorney "leads the client to believe he is still the lawyer" is indefensible and fails as a matter of law. The position is so rarely taken that courts have hardly ever been called upon to write about it. In each instance we have been able to find where courts addressed Joel's position, the court held an attorney may not unilaterally withdraw from representation, but at a minimum, must take some action to communicate to the client his intent to withdraw. *See, e.g., Krutzfeldt Ranch, LLC v. Pinnacle Bank,* 363 Mont. 366, 272 P.3d 635, 642 (2012) (stating an attorney may not unilaterally withdraw from representation, but "remain[s] in an attorney-client relationship"—even after joining another law firm—in the "absence of any affirmative steps" by the attorney to withdraw); *Garrett (formerly Matisa) v. Matisa,* 394 N.J.Super. 468, 927 A.2d 177, 178–79, 182 (2007) (holding "[i]t is well settled that an attorney who wants to withdraw from repre-

---

7. In *Strom* and *Graham,* the attorney in question was counsel of record in a pending lawsuit. *Strom,* 343 S.C. at 260, 539 S.E.2d at 700; *Graham,* 272 S.C. at 450, 248 S.E.2d at 598. For purposes of the attorney's duty to communicate his intent to withdraw to his client, that difference from these facts makes no difference.

senting a client must notify the client in advance" and "notify the client of the grounds for withdrawal," even in a situation where a client "effectively disappeared" and her attorney was unable to contact her); *Mobberly v. Hendricks*, 98 Ohio App.3d 839, 649 N.E.2d 1247, 1249 (1994) (stating "an attorney is not free to withdraw from the relationship absent notice to his client" and "[i]n determining when the attorney-client relationship is terminated, the court must point to an affirmative act by either the attorney or the client that signals the end of the relationship"); *Cardot v. Luff*, 164 W.Va. 307, 262 S.E.2d 889, 892 (1980) (recognizing "[m]ost courts require that before an attorney can unilaterally sever the attorney-client relationship, he must give reasonable notice to his client of his intention to withdraw," and noting "further requirement[s]" are necessary "[i]f the withdrawal involves a matter pending in court"). Joel cites no cases to support his position.

In conclusion, there is no evidence Joel took any action to end his attorney-client relationship with Tuten, and thus no jury could reasonably conclude Joel withdrew from the representation. Rather, the evidence yields only one reasonable inference—Joel remained Tuten's attorney at the time the circuit court dismissed her lawsuit, and as her attorney, he owed her the duties attendant to that relationship. The trial court correctly granted a directed verdict for Tuten on this element.

## B. Breach of Duty

An attorney owes his client fiduciary duties, *Spence v. Wingate*, 395 S.C. 148, 160, 716 S.E.2d 920, 927 (2011), and he must "render services with the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of the profession." *Harris Teeter, Inc. v. Moore & Van Allen, PLLC*, 390 S.C. 275, 282, 701 S.E.2d 742, 745 (2010) (citation omitted). When an attorney agrees to represent a client for the purpose of filing a lawsuit on the client's behalf, the attorney's fiduciary duty requires him to take action to prosecute the lawsuit.[8] The failure to take any

---

8. There are circumstances—not present in this case—under which an attorney may choose not to pursue a lawsuit without breaching his duty to his client, including: (1) the attorney determines there is not good legal and factual ground to support the claim; *see* Rule 11(a), SCRCP

action under the circumstances of this case is a breach of the attorney's duty to the client. There is no evidence Joel took any action to prosecute Tuten's lawsuit. Therefore, the trial court correctly granted a directed verdict in favor of Tuten on this element.

Joel contends it was unnecessary for him to personally take action to prosecute Tuten's case because Glover was handling the case. In his brief, Joel states, "Glover was the attorney who operated the South Carolina office," and while that office was open, "Tuten understood that Ms. Glover worked for Mr. Joel." The legal consequence of Joel's argument is Glover was his agent. *See* 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 5:8, at 528 (2014 ed.) ("A principal attorney, typically an owner or managing attorney, is responsible for the ... conduct of employed attorneys...."). As we explained, Joel remained Tuten's attorney even after he closed his South Carolina office. To the extent Joel claims he continued to rely on Glover to handle Tuten's case, Glover necessarily remained his agent, and Joel remained responsible for her conduct. Joel asserted at trial Glover was negligent as a matter of law, and argues the same position on appeal. Under Joel's agency theory, therefore, he is liable for Glover's breach of duty.

### C. Proximate Cause

Although proximate cause is ordinarily a jury question, the court may decide proximate cause as a matter of law "when the evidence is susceptible to only one inference." *Pope v. Heritage Cmtys., Inc.*, 395 S.C. 404, 416, 717 S.E.2d 765, 771 (Ct.App.2011). Here, Joel's failure to take any action to prosecute Tuten's lawsuit against Still indisputably resulted in the dismissal of the lawsuit. Because Joel's failure to fulfill his fiduciary duty to prosecute Tuten's lawsuit was as a matter of law the proximate cause for the lawsuit being dismissed, the trial court correctly granted a directed verdict in favor of Tuten on this element.

---

(requiring a certificate by an attorney that any pleading has "good ground to support it"); (2) the attorney effectively withdraws in a timely manner; and (3) the client makes an informed decision not to pursue the lawsuit.

Joel argues, however, Tuten was not entitled to a directed verdict on proximate cause because there was disputed evidence regarding whether she could collect a judgment against Still. We find this argument unpersuasive for two reasons. First, our courts have never required a legal malpractice plaintiff to prove collectibility when the malpractice caused the dismissal of an underlying lawsuit. Joel has not cited a single case applying such a requirement.[9]

Second, Tuten conclusively proved she could collect at least some portion of a judgment against Still. Joel conceded at oral argument that Tuten had an automobile insurance policy with uninsured and underinsured coverage. He further conceded the insurance policy would have been available to Tuten had she won a judgment against Still. Thus, had Joel taken some action to prosecute Tuten's claims against Still, Tuten could have recovered some money through her insurance policy.

Joel also argues Glover was negligent as a matter of law, and her negligence was a "superseding and intervening" event that "interrupted any causation link between any negligence that might have existed on" his part. While it is true Glover was negligent because she failed to take any action to prosecute Tuten's lawsuit against Still, Joel was negligent for the same reason. Thus, Joel's arguments addressing Glover's liability prove Joel is liable to Tuten as a matter of law.

The trial court correctly granted a directed verdict in favor of Tuten on the element of proximate cause because the evidence was susceptible to only one inference—that Joel's negligence proximately caused at least some of Tuten's damages.

---

9. Joel cites only a comment from the Restatement (Third) of the Law Governing Lawyers, which provides that in a legal malpractice action, "the lawyer's misconduct will not be the legal cause of loss to the extent that the defendant lawyer can show that the judgment or settlement would have been uncollectible. . . ." Restatement (Third) of The Law Governing Lawyers § 53 cmt. b (2010). The comment continues, *"The defendant lawyer bears the burden of coming forward with evidence that this was so." Id.* (emphasis added). Even if South Carolina courts were to recognize a collectibility requirement—which we find is not necessary to decide in this case—the only authority Joel cites to support his position required him to prove a judgment against Still was uncollectible, which he did not do.

### III. Joel's Directed Verdict Motion

Joel also made a directed verdict motion on Tuten's legal malpractice claim. For the reasons explained above, we find the trial court correctly denied Joel's directed verdict motion.

### IV. New Trial Nisi Remittitur

Finally, Joel argues he was entitled to a new trial nisi remittitur because the evidence presented at trial did not support the jury's award of $275,000 in damages. We disagree and affirm the trial court's denial of remittitur. *See James v. Horace Mann Ins. Co.*, 371 S.C. 187, 193, 638 S.E.2d 667, 670 (2006) (stating the trial court has discretionary power to deny a motion for a new trial nisi, and an appellate court will not reverse the trial court's decision absent an abuse of that discretion).

Tuten testified that as a result of the wreck, she suffered a broken vertebra, a collapsed lung, three broken ribs, and a concussion; stayed in the hospital trauma unit for a week; and had to wear a back brace for more than a year. Her medical bills totaled at least $24,571.82, and she was on social security disability due to her injuries. This evidence provided a factual basis for the jury's verdict, and therefore, the trial court acted within its discretion in denying remittitur. *See V.E. Amick & Assocs. v. Palmetto Envtl. Grp.*, 394 S.C. 538, 551, 716 S.E.2d 295, 302 (Ct.App.2011) (stating the trial court does not abuse its discretion in denying a motion for new trial nisi remittitur when "the record contains adequate evidence to support the jury's verdict"); *Burke v. AnMed Health*, 393 S.C. 48, 57, 710 S.E.2d 84, 89 (Ct.App.2011) (stating "we employ a highly deferential standard of review when considering the trial judge's [denial of] a new trial [nisi remittitur]" and "as an appellate court, we sit neither to determine whether we agree with the verdict nor to decide whether we agree with the trial judge's decision not to disturb it").

### V. Conclusion

We find the trial court correctly granted Tuten's motion for a partial directed verdict, correctly denied Joel's motion for a

directed verdict, and acted within its discretion in denying Joel's motion for a new trial nisi remittitur. We **AFFIRM.**

SHORT, J., concurs.

GEATHERS, J., concurring in a separate opinion.

I concur in the majority's conclusion that Joel failed to take the necessary action to withdraw from his representation of Tuten. I further concur in the majority's observation that Joel admitted he had an agreement with Glover to share fees generated from those cases considered "open matters" when Joel closed his Columbia office in May 2006. But I would end the analysis of this matter there and refrain from drawing the conclusion the majority draws regarding Joel's lawsuit against Wachovia, i.e., the lawsuit was premised on the existence of Joel's May 2006 fee agreement with Glover.

Joel's Complaint asserted that Wachovia converted certain checks made payable to Joel & Associates by making payment on them to Heather Glover, who was "not entitled to enforce the instruments or receive payment." While the Complaint undoubtedly references the May 2006 fee-sharing agreement, the record does not substantiate the conclusion that this agreement served as the basis for Joel's asserted right to recover converted funds. It is conceivable that, as Joel indicated in his testimony and Reply Brief: (1) the converted funds were fees generated from cases referred to other firms for litigation before Joel closed his Columbia office; and (2) the Complaint's reference to the disputed fee-sharing agreement served merely as background material explaining how Glover obtained possession of the disputed funds. For this same reason, I also depart from the conclusion that the proceeds of Joel's lawsuit against Wachovia represented fees Glover owed him pursuant to the May 2006 fee-sharing agreement.

Joel testified on redirect examination that the alleged converted funds, which included funds sent by the McWhirter firm, had nothing to do with the approximately seventy-seven open matters Glover took with her when the Columbia office closed. The dates on the McWhirter checks are not, by themselves, inconsistent with this testimony. Further, no other evidence in the record contradicts Joel's testimony. In

120

fact, Glover's May 14, 2006 e-mail to Joel corroborates Joel's testimony as it indicates that neither McWhirter nor the other two attorneys that Joel and Glover had previously worked with were willing to take any of the seventy-seven open matters without obtaining advance written permission from the clients.